GREGORY C. LOARIE, State Bar No. 215859
CHRISTOPHER W. HUDAK, State Bar No. 282283
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
T: (415) 217-2000 / F: (415) 217-2040
gloarie@earthjustice.org
chudak@earthjustice.org

*Counsel for Proposed Defendant-Intervenors*
*The Wilderness Society, et al.*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

| | |
|---|---|
| FRIENDS OF TAHOE FOREST ACCESS, *et al.*,<br><br>              Plaintiffs,<br><br>       vs.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*,<br><br>              Defendants,<br><br>       and<br><br>THE WILDERNESS SOCIETY, *et al.*,<br><br>              Proposed Defendant-Intervenors. | Case No. 2:12-cv-01876-JAM-CKD<br><br>DECLARATION OF GREGORY C. LOARIE IN SUPPORT OF MOTION TO INTERVENE |

I, Gregory C. Loarie, hereby declare as follows:

1.     I am an attorney at the California Office of Earthjustice and counsel of record for proposed intervenors The Wilderness Society *et al.* in the above-entitled case. I have personal knowledge of the matters stated herein and, if called as a witness, could and would competently testify thereto.

2.     On July 20, 2012, I received via electronic mail from Stan Van Velsor, ORV Campaign Coordinator at The Wilderness Society, a copy of proposed intervenors' administrative appeal of the Tahoe National Forest Travel Management Decision at issue in this case. A true and correct copy of that administrative appeal is attached hereto.

1        I declare under penalty of perjury that the foregoing is true and correct and within my

2   personal knowledge and belief.

3

4   DATED:  October 2, 2012.

5

6

7

8                              Gregory C. Loarie

Attachment

# BEFORE THE REGIONAL FORESTER,
# U.S. DEPARTMENT OF AGRICULTURE,
# FOREST SERVICE, PACIFIC SOUTHWEST REGION

THE WILDERNESS SOCIETY, FOREST          )
ISSUES GROUP, PUBLIC EMPLOYEES          )
FOR ENVIRONMENTAL                       )
RESPONSIBILITY, CENTER FOR              )
SIERRA NEVADA CONSERVATION,             )
SIERRA FOOTHILLS AUDUBON                )
SOCIETY, MOTHER LODE CHAPTER            )
OF THE SIERRA CLUB, NORTH FORK          )
AMERICAN RIVER ALLIANCE AND             )
THE SOUTH YUBA RIVER CITIZENS           )   **In Re: Appeal of September 21, 2010**
LEAGUE                                  )   Record of Decision for the Tahoe
                                        )   National Forest Motorized Travel
Appellants                              )   Management Final Environmental
                                        )   Impact Statement
                                        )
          v.                            )
                                        )
                                        )
**Tom Quinn, Forest Supervisor**
**Tahoe National Forest**


Respondent

## APPELLANTS' CONTACT INFORMATION

- **THE WILDERNESS SOCIETY** (Lead Appellant): Stan Van Velsor, Policy Associate, 655 Montgomery Street, Suite 1000, San Francisco, CA 94129. Phone: (415) 398-1111.

- **FOREST ISSUES GROUP:** Don Rivenes, Executive Director, 12826 Newtown Rd, Nevada City, CA 95959. Phone: (530) 477-7502.

- **PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY:** Karen Schambach, California Coordinator, PO Box 4057, Georgetown, CA 95634. Phone: (530) 333-2545

- **SIERRA FOOTHILLS AUDUBON SOCIETY:** Connie Stevens, President, PO Box 1937, Grass Valley CA 95945. Phone (530) 268-2268

- **MOTHER LODE CHAPTER OF THE SIERRA CLUB:** Barbara Rivenes, Secretary, 12826 Newtown Rd, Nevada City, CA 95959. Phone: (530) 477-7502.

- **SOUTH YUBA RIVER CITIZENS LEAGUE:** Jason Rainey, Executive Director

- **CENTER FOR SIERRA NEVADA CONSERVATION**, Ray Griffiths, Vice-President, P.O. Box 603, Georgetown, CA  95634.  Phone (530) 333-1113

- **NORTH FORK AMERICAN RIVER ALLIANCE**, Jim Ricker, President, P.O. Box 292, Gold Run, CA 95717. Phone (530) 389-8344

## CERTIFICATION OF FILING

This appeal was filed by electronic transmission to:
appeals-pacificsouthwest-regional-office@fs.fed.us

ATTN: Regional Forester Randy Moore, Appeals Deciding Officer, 1323 Club Drive, Vallejo, CA  94592.

Dated this 1st of December, 2010.


_____
Stan Van Velsor

Also on behalf of the following:
(signatures verified on request)

Don Rivenes, Executive Director
Forest Issues Group

Karen Schambach, California Coordinator
Public Employees for Environmental Responsibility

Connie Stevens, President
Sierra Foothills Audubon Society

Barbara Rivenes, Executive Committee Forestry Chair
Mother Lode Chapter of the Sierra Club

Jason Rainey, Executive Director
South Yuba River Citizen's League

Ray Griffiths, Vice-President
Center for Sierra Nevada Conservation

Jim Ricker, President
North Fork American River Alliance

**APPELLANTS'**
**NOTICE OF APPEAL AND STATEMENT**
**OF REASONS**

## I.   NOTICE OF APPEAL

Notice is hereby given that, pursuant to the U.S.D.A. Forest Service Regulations at 36 C.F.R. part 215, The Wilderness Society, Forest Issues Group, Public Employees for Environmental Responsibility, Sierra Foothills Audubon Society, Mother Lode Chapter of the Sierra Club, Center for Sierra Nevada Conservation, and the South Yuba River Citizens League appeal to Randy Moore, Regional Forester, U.S.D.A. Forest Service, for relief from Forest Supervisor Tom Quinn's  Record of Decision (ROD) signed on September 21, 2010, for the Tahoe National Forest Motorized Travel Management Final Environmental Impact Statement (FEIS).

This appeal is consistent with 36 C.F.R. § 215.11 and is based upon written comments submitted by Appellants during the scoping period, comments on the Draft Environmental Impact Statement (DEIS), comments on the Supplemental Environmental Impact Statement (SDEIS) and face-to-face contacts and oral communications with Tahoe National Forest staff.  This appeal is consistent with 36 C.F.R. § 215.14 (Appeal Content) in that we are submitting substantial evidence of violations of law, regulation, and policy contained in the ROD and FEIS, requiring remand or reversal of said decision.

## II.   STATEMENT OF POSITION

With this appeal, Appellants seek to ensure that motorized travel on the Tahoe National Forest is managed sustainably to ensure the long-term health of the affected environment and to minimize conflicts with other important uses of the Forest. Management practices approved by the ROD will fail to halt resource damage, fail to reduce conflicts with other recreational users, fail to ensure that water quality goals are met, and fail to meet other important resource objectives.

This appeal of the Tahoe Motorized Travel Management ROD will show that important and timely comments and reasonable, feasible management alternatives provided by interested members of the public during the National Environmental Policy Act (NEPA) process were inadequately addressed by Forest officials.  The Final Environmental Impact Statement for the ROD omits critical information, fails to respond to public comments, and provides and relies upon incorrect claims and statements.  Furthermore, the Forest selected an action alternative that fails to comply with multiple legal requirements to minimize impacts to resources and to non-motorized recreation.  Appellants will show that the Forest failed to adopt management solutions that would meet the statement of Purpose and Need, provide for diverse recreational opportunities, minimize environmental impacts, and markedly reduce recreational conflicts.  The ROD and FEIS fail to reasonably consider available funding that would be necessary to maintain, to monitor, and to mitigate as claimed in the ROD.  And finally, the Forest has improperly proceeded to carry out route designation under Subpart B of the Travel Management regulations without first following the requirements under Subpart A.

2

## III.   STATEMENT OF REASONS

### A.  THE ROD AND FEIS VIOLATE THE NATIONAL ENVIRONMENTAL POLICY ACT

#### 1.  *FAILURE TO ANALYZE A FULL RANGE OF REASONABLE ALTERNATIVES*

The Council on Environmental Quality's NEPA regulations describe the alternatives section as the "heart" of the EIS, and require that an EIS's alternatives section "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14.  NEPA regulations provide that an EIS must include "the alternative of no action," as well as a "hard look" at "all reasonable alternatives."[1]  In examining the reasonableness of an EIS's alternatives and elimination of alternatives from analysis, a court first looks to whether the "Purpose and Need" was reasonable, and then whether the alternatives considered were reasonable in light of that goal.  *Surfrider Found. v. Dalton*, 989 F.Supp. 1309, 1327 (S.D. Cal. 1998), *aff'd per curium*, 196 F.3d 1057 F.3d 1057 (9th Cir. 1999).  Regarding alternatives rejected for full evaluation, a court asks "whether the summary rejection of these sites was unreasonable, such that the [EIS] failed to consider a reasonable range of alternatives."  *Id.* at 1327–28 ("An unreasonable failure to consider a viable alternative renders an alternatives analysis inadequate.").

The Forest Service Handbook guides managers to "develop . . . alternatives fully and impartially . . . [and to] ensure that the range of alternatives does not prematurely foreclose options that might protect, restore, and enhance the environment."[2] Much legal precedent guards against an insufficient range of alternatives.[3] NEPA also requires that agencies "present complete and accurate information to decision-makers and to the public to allow an informed comparison of the alternatives considered in the EIS." *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005).  The Forest Service failed in this mandate by not considering in detail an alternative with net reductions in the number of system route miles, an alternative reflective of a minimum road system (i.e., one that would have been defined by Travel Analysis), or an alternative with a motor vehicle route system that minimizes resource impacts (i.e., one that would have complied with the minimization criteria of the Travel Management Rule (TMR) and

---

[1] 42 U.S.C. § 4332(c); 40 C.F.R. § 1502.14(a), (d).

[2] Forest Service Handbook  1909.15 § 14

[3] "An agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action." *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1538 (9th Cir. 1997). An agency violates NEPA by failing to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1310 (9th Cir. 1990) (quoting 40 C.F.R. § 1502.14). This evaluation extends to considering more environmentally protective alternatives and mitigation measures. *See, e.g., Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1122–23 (9th Cir. 2002) (and cases cited therein). NEPA requires that an actual "range" of alternatives is considered, such that the Act will "preclude agencies from defining the objectives of their actions in terms so unreasonably narrow that they can be accomplished by only one alternative (i.e. the applicant's proposed project)." *Col. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1174 (10th Cir. 1999) (citing *Simmons v. U.S. Corps of Eng'rs*, 120 F.3d 664, 669 (7th Cir. 1997)). This requirement prevents the EIS from becoming "a foreordained formality." *City of New York v. Dep't of Transp.*, 715 F.2d 732, 743 (2d Cir. 1983).  *See also Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002).

Executive Order 11644).  This failure has caused the Forest to foreclose options that would protect, restore, or enhance the environment.  Moreover, the Forest Service failed to provide a rational explanation as to why these alternatives should not be considered in detail.

While we have serious concerns about the purpose and need identified by the agency, which are addressed below, the Forest Service's narrow interpretation of the existing purpose and need statement was also arbitrary, resulting in the Forest Service's failure to consider a reasonable range of alternatives.  The Forest Service summarily rejected the alternatives described below, in large part, because it said these alternatives were outside the scope of the purpose and need. However, the statement of purpose and need indicates "There is a need for regulation of unmanaged motorized vehicle travel by the public. The proliferation of unplanned, non-sustainable roads, trails and areas adversely impacts the environment". Further "any changes to the NFS roads, motorized trails and areas should also achieve the following purposes: administer and maintain roads, trails and areas based on availability of resources, minimize damage to soil, vegetation and other forest resources, avoid harassment of wildlife and significant disruption of wildlife habitat, and minimize conflicts between motor vehicles and existing or proposed recreational uses of NFS lands. (DEIS page 4).

> ### a.   The Forest Service Failed To Analyze An Alternative That Would Result In A Net Reduction In The Designated System's Mileage (Road Closures).

The Forest Service failed to consider a reasonable range of alternatives because no alternative proposes closures of existing, designated routes, which would result in a net reduction of the mileage of the designated travel system.  Given that OHVs are associated with both the ignition of wildfires, negative effects to water quality and wildlife habitat, and the spread of exotic weeds, the Forest Service should have included an alternative based primarily on road closures and restoration of areas previously damaged by OHVs.

When considering designations for OHV use, courts have held that a land management agency may not privilege one type of use over another, thereby precluding from its analysis alternatives that would close routes to OHV use.  *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.* (*ONDA v. BLM*), 531 F.3d 1114, 1145 (9th Cir. 2008); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, No. C 06-4884 SI, at *40-41 (N.D. Cal. Sept. 28, 2009).

> It is precisely this sort of "uncritical [ ]" privileging of one form of use over another that we have held violates NEPA. *See Block,* 690 F.2d at 767. Closures, not just "limited" designations, must be considered to comply with NEPA.

*ONDA v. BLM*, 531 F.3d at 1145.  Here, the Forest Service considered only alternatives that would leave in place or add to the Forest's massive existing, designated system.  In so doing, the agency failed to consider a reasonable range of alternatives.

The table below compares the activities that would occur under each alternative. (Page vii SDEIS)

4

**Table S-3. Comparison of Alternatives Action type**

| | Alt 1 | Alt 2 | Alt 3 | Alt 4 | Alt 5 | Alt 6 | Alt 7 |
|---|---|---|---|---|---|---|---|
| 1. Cross Country Travel (Acres) | Prohibitions continue on 81,975 acres Continues on 754,066 acres | Prohibited on 833,392 acres 2,649 acres established open | Prohibited on 836,000 acres <100 acres established open | Prohibited on 836,000 acres <100 acres established open | Prohibited on 836,000 acres <100 acres established open | Prohibited on 835,800 acres <300 acres established open | Prohibited on 836,000 acres <100 acres established open |
| **2. Additions to the NFTS** a. Roads added to the NFTS (Number of Miles) (Number of Roads) | 0.0 0 | 5.0 114 | 0.00 0 | 3.7 85 | 5.0 112 | 13.1 346 | 0.00 0 |
| b. Motorized Trails added to the NFTS (Number of Miles) (Number of Trails) | 0.0 0 | 54.6 87 | 0.0 0 | 22.6 27 | 75.4 141 | 48.3 106 | 36.7 36 |
| 3. Establishment of Motorized "Open Areas" | None | Greenhorn Area (60 acres) Prosser, Boca and Stampede Reservoirs (2,589 acres) | None | None | None | Prosser, Boca and Stampede Reservoirs (244 acres) | None |
| **4. Changes to the NFTS** a. Change in Class of Vehicles resulting from approval of mixed use | 0.0 | 241.5 | 0.0 | 0.0 | 241.5 | 130.8 | 0.0 |
| b. Change in Class of Vehicles resulting from changes in maintenance levels | 0.0 | 157.2 | 0.00 | 3.4 | 157.2 | 122.0 | 3.4 |
| c. Change in Season of Use | 0.0 | 10.5 | 0.00 | 1,312.1 | 1,396.7 | 1,369.5 | 0.00 |
| d. Reopening Maintenance Level 1 Roads (Number of Miles) (Number of Roads) | 0.0 0 | 0.0 0 | 0.0 0 | 0.1 1 | 93.4 113 | 11.4 13 | 1.1 2 |
| **5. Amendments to the Forest Plan** | None | Management Area 84 (Humbug Sailor) Deer Winter Range Seasonal Restriction Removed | None | None | Management Area 84 (Humbug Sailor) Deer Winter Range Seasonal Restriction Removed | Management Area 84 (Humbug Sailor) Deer Winter Range Seasonal Restriction Removed | None |

As can be seen from Table S-3, the alternatives proposed by the Forest Service only maintain the existing mileage (excluding illegal cross-country travel) or increase it by designating user-created routes. This will not meet the objective of: "administer and maintain roads, trails and areas based on availability of resources".

The Forest arbitrarily limited the scope of the planning effort to fit what appears to be a pre-determined outcome. The Tahoe National Forest has arbitrarily constrained the range of alternatives in the FEIS by not considering in detail an alternative that incorporates various public comments regarding the removal of motor vehicle routes from the system, some of which are documented to be causing resource damage or have been identified by the Forest Service as unneeded.  The Forest maintains that they are dealing only with "limited changes" to the transportation system.  But the Forest does not disclose how those limited changes were determined, or what exactly may qualify as a "limited change," and rejected appellants' suggestions regarding changes to the existing system without justification.

5

We proposed an alternative that would have resulted in modest reductions based on errors in the baseline system and identified resource concerns, which would have resulted in a 4.8 % reduction to the system (based on 120.7 miles of existing IRA routes out of 2495.3 total routes. The latter number corrects an addition error in the Summary of Actions). A fully fleshed out range of alternatives would have better explored and expanded upon these suggestions, and the decision by the agency to reject those proposals without further analysis was arbitrary and capricious.

The FEIS describes and rejects Alternative H which would "close and decommission a number of roads and trails to reduce road density and disturbance to wildlife; prevent incursions into Wild and Scenic River corridors through road closures,; reduce access adjacent to Wilderness through road closures; not add trails that are in Roadless Areas; implement a seasonal closure for the protection of wildlife; and allow some number of motorized trails to be added to the NFTS". This alternative would fall comfortably within the Purpose and Need as stated in the FEIS. To reject it as outside the scope because of the "need for the project to make limited changes to the existing NFTS" does not make sense when one considers the major changes in vehicle class use and seasonal restrictions proposed for the preferred alternative, and the major effort undertaken to correct existing maps for NEPA errors. Therefore, the Forest Service's decision not to examine these alternatives in detail constitutes a violation of NEPA's requirement that the agency consider a reasonable range of alternatives.

The position taken by the Tahoe that removal of system routes is beyond the scope of this project is not supported by the purpose and need of this project. The 2.00-36 Range of alternatives response to our comments stated "Identifying the minimum road system and proposing additional closure of NFTS roads and trails currently designated as open for travel is outside of the scope of this decision." This statement contradicts the fact that the proposed action changes seasonal use on 1369.5 miles of NFTS roads, changes mixed-use rules on 130.8 miles of NFTS roads, changes 122 miles of roads for Class of Vehicles resulting from change in maintenance levels, closes 508.9 miles of roads that are currently shown in the system due to map errors, and amends the Forest Plan to re-open 13 roads for 11.4 miles that would otherwise be closed. The Forest could have and should have considered closing currently-open NFTS routes as part of the changes to the NFTS; it is arbitrary for the Forest Service to reject these suggestions as beyond the scope of the NEPA analysis.

The FEIS gives no convincing rationale for this decision to ignore public comments concerning the documented resource impacts of specific roads and to refuse to consider removal of routes from the designated system. Thus, the FEIS's unreasonably narrow range of alternatives made the decision to increase the size of the NFTS a foreordained conclusion and the decision is arbitrary and capricious. This is a clear violation of NEPA.

### b.  *Minimum Road System Alternative*

The FEIS should have included an alternative emphasizing a *minimum* transportation system that is streamlined, non-redundant, and protects natural resources by minimizing impacts from motorized use. A range of alternatives that neither includes the minimum transportation system

nor considers proposals for road closures, as discussed above, is not sufficient under NEPA.  By not responding to or considering in detail our requests that the Forest conduct Travel Analysis to determine a minimum transportation system alternative, the Forest prematurely foreclosed options that might protect, restore, or enhance the environment.

The US Environmental Protection Agency commented in a DEIS letter dated December 24, 2008:

> We acknowledge the constraints of funding and resources; nevertheless we had hoped the Forest Service would take this opportunity to review and rationalize the NFTS, pursuant to Travel Management Rule direction to identify the minimum road system needed (36 CFR Part 212 Subpart A) and to address known road-related resource impairments and use conflicts of both the existing NFTS and unauthorized user-created system, and align the transportation system with maintenance and enforcement capabilities. Route designations are only a part of what is needed to reduce the ongoing adverse impacts to water quality and other resources from the NFTS. We continue to believe a more holistic approach to travel management planning, whereby route designations are guided by travel analysis, known locations of resource impairment, and prior determination of the minimum road system needed, would better serve the long-term interests of the public, forest service, and National forest resources.

> Recommendations: The FEIS should describe the minimum Forest road system needed and how this information was used to formulate the motorized travel management alternatives. If the minimum road system needed has not been identified, the FEIS should describe how the optimal road system will be identified pursuant to the requirements of the Travel Management rule (36 CFR Part 212 Subpart A). We recommend that the Forest expand the scope of this action for seasonal or permanent closure to public motorized use, current NFTS roads and trails with known resource impacts or conflicts with other recreational users and experiences. For example, consider closure of impaired maintenance level 2 native surface roads until adverse impacts to these roads are addressed.

The Draft Roads Analysis –Tahoe National Forest (August 1, 2004) presents in Chapter 4 this table:

**Table 4-5. Percent of road system (miles) with a high potential aquatic risk by HUC4 river basin.**

| River Basin Name | Miles of Road with High Aquatic Risk * | Percent of Roads with High Aquatic Risk * |
|---|---|---|
| North Fork American River | 467.9 | 40.4 |
| Upper Bear River | 68.9 | 36.7 |
| Middle Fork Feather River | 213.2 | 39.9 |
| Truckee River | 361.6 | 29.4 |
| Yuba River | 1138.4 | 43.9 |

The Chapter 6 Summary and Key findings of the report are:
1) The funding for road maintenance is inadequate to fully maintain the road system to standards.

      i)     The backlog of deferred road maintenance for the primary roads continues to grow while funding for maintenance continues to decline. The continued negative budget trend may compromise user safety and future access.

      ii)    The backlog of deferred road maintenance for the local roads continues to grow while funding levels continue to decline. Very limited amount of funding goes to maintaining the local roads system. Collectively the local road system poses the highest potential risks to the environment.

For example: The Draft Roads Analysis rates Road 35 (Cal Ida Scales) as moderately high aquatic risk and high terrestrial risk. Appendix A for Road 35-3_P shows high erosion risk and moderately high Water Quality Risk, yet no mitigation measures are required in the FEIS/ROD. Similar results are shown for 35-4_P and 35-4-1_P. All routes are recommended for designation in the ROD.

Throughout Appendix A, many routes selected for continued motorized use by the ROD are indicated to carry high risks for erosion and water quality and routes going through wildlife nesting and foraging habitat, but no mitigations are required. The refusal to consider an alternative that would close these routes or otherwise minimize the impacts from these routes is arbitrary and capricious and must be remedied in a new analysis and decision.

### c.  *Minimization of Impacts Alternative*

Furthermore, a range of alternatives that does not include an alternative that minimizes impacts to natural resources and conflicts between recreationists fails to comply with NEPA, the travel management rule, NFMA, and Executive Order (E.O.) 11644, as amended by E.O. 11989.

In our scoping and DEIS comments we suggested removal of particular routes to address resource concerns from the existing and proposed NFTS, such as impacts on Roadless Areas, Wild & Scenic Rivers, and sensitive wildlife habitat.  There are 129.3 miles of motorized roads and trails within roadless areas *(DEIS volume 3 page 561 Table 3.06-16)*. These should be evaluated for decommissioning as part of this proposal. We realize that construction, reconstruction, or maintenance of existing NFS motorized trails is not prohibited by the 2001 Roadless Rule, but there is a responsibility to maintain these areas as potential wilderness. Some of these areas have already been proposed for wilderness by citizens. It certainly degrades the roadless experience for nonmotorized recreation. We feel that it is disingenuous to allow a route greater than 50 inches in width in a roadless area to be called a trail. Trails that are over 50 inches in width and/or are open to full size vehicles have impacts that are more akin to roads than the impacts from what is traditionally thought of as a "trail."  Roads are more harmful than trails to wildlife habitat and water quality, particularly when not adequately maintained. Some roadless areas (EW Yuba) are the largest areas of prime habitat for spotted owl.

The SDEIS cover letter claims: "Increased protection for the Forest's Inventoried Roadless Areas (IRAs) by adding only a few routes, all of which lie on the periphery of these areas, to the NFTS". We fail to see how "adding only a few routes" constitutes increased protection, given that unauthorized routes should never have been allowed to be created in these key areas. This

statement also fails to address the negative impacts from permanently adding these routes to areas that were protected to "provide clean drinking water and function as biological strongholds for populations of threatened and endangered species. . . . provide large, relatively undisturbed landscapes that are important to biological diversity and the long-term survival of many at risk species. . . . [and] provide opportunities for dispersed outdoor recreation."  66 Fed. Reg. 3245.  Under California SB742, routes in IRAs designated after January 1, 2009 are not eligible for state OHV maintenance grants. Given the Tahoe's budgetary limitations, this should have been considered before proposing to designate any additional routes in IRAs.

Instead of analyzing these closures in an alternative, the Forest eliminated our recommendations from detailed analysis, as is described above in the failure to analyze removal of routes from the designated system. Evaluation of these and other route closures would have allowed the Forest Service to develop an alternative that actually met the Subpart B requirements to minimize damage to forest resources and minimize conflict between recreationists.[4] Such an alternative would also have allowed the Forest Service to better manage for and adapt to the effects of climate change, which Secretary Vilsack has described as a primary objective in forest management.

Multiple use directives do not require the Forest Service to increase motorized forest uses because population goes up. There are also more non-motorizedrecreationalists who haven't created 1,400 miles of unauthorized trails. The Forest Service must recognize carrying capacity of the forest. At a time when citizens are being asked to cut their use of fossil fuels and associated emissions, it is irresponsible to be considering adding more access to remote locations for OHV use.

The Forest Service failed to consider "conflicts between motor vehicle use and existing or proposed recreational uses of National Forest System lands" as required by 36 CFR 212.55(b)(3) by failing to establish areas preserved for clean and quiet recreation.   This failure is particularly evident when snow is on the ground and motorized vehicles are allowed full reign of the forest. In order to achieve their purpose, such roads must be closed to motorized travel.  Failure to analyze an alternative that minimizes impacts from the designated system is a violation of NEPA.  It is also a substantive violation of the requirements in the travel management rule and Executive Order 11644, as amended, for failure to minimize the impacts from designating ORV use on public lands.

### d.   Climate Change Adaptation Alternative

The Forest Service improperly excluded from this analysis an alternative that examines the beneficial environmental effects of significantly reducing motorized use on the forest. An understanding of the predicted impact of climate change should, in turn, shape in important ways the various alternatives under consideration by the Forest Service. For example, given that so many of the predicted outcomes of climate change center on increased soil erosivity, dust storms, shrinking water resources, drier riparian areas, invasion of exotic plants, and the spread of hotter,

---

[4] In our DEIS comments we provided a list of proposed changes to the transportation system, route by route, and with explanations. The ROD and FEIS did not address or analyze these proposed changes.

larger wildfires, it is entirely reasonable to expect the Forest Service to design alternatives that minimize soil disturbance as much as possible.

As such, the failure to analyze an alternative that addresses climate change is arbitrary and capricious and in violation of law and regulations.

## 2. THE FOREST SERVICE'S IDENTIFICATION AND IMPLEMENTATION OF THE "PURPOSE AND NEED" STATEMENT ARE ARBITRARY.

The project's purpose and need statement is artificially narrow and fails to comply with the requirements of the NEPA. An agency may not define its objectives in such unreasonably narrow terms that only one course of action would satisfy the purpose and need. *See*, *e.g.*, *Citizens Against Burlington v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991); *Envtl. Protection Information Ctr. v. Blackwell*, 389 F.Supp.2d 1174, 1199 (N.D. Cal. 2004) (holding purpose and need must not be so narrow as to make selection of an alternative a "foreordained formality").  Because the statement of purpose and need sets the stage for the range of alternatives an agency must examine, it must not be so narrow as to artificially limit the alternatives considered.  *See*, *e.g.*, *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997).

"There is a need for regulation of unmanaged motorized vehicle travel by the public. The proliferation of unplanned, non-sustainable roads, trails and areas adversely impacts the environment". Further "any changes to the NFS roads, motorized trails and areas should also achieve the following purposes: administer and maintain roads, trails and areas based on availability of resources, minimize damage to soil, vegetation and other forest resources, avoid harassment of wildlife and significant disruption of wildlife habitat, and minimize conflicts between motor vehicles and existing or proposed recreational uses of NFS lands. (DEIS page 4).

The Forest restricted its Purpose and Need statement to inappropriately exclude impacts from the existing NFTS and an evaluation of the continued need for impactful system routes. In doing so, the Forest ignored the reality that the present NFTS is harming the resource they are supposed to be managing, sidestepped regulations that have been in place since 2001 that address identification of a minimum road system, failed to comply with the requirements in 36 C.F.R. § 212.55, and missed an important opportunity to reduce impacts from its entire transportation system. We also need to point out that applying seasonal restrictions for existing routes required review of existing routes, which the Forest Service claims to be beyond the purview of this proposal.

As previously noted on p. 7, the US Environmental Protection Agencycommented in a DEIS letter dated December 24, 2008 that the Tahoe should address the impacts from its existing system routes and identify a minimum road system as required by 36 CFR 212 Subpart A.

This restriction of the purpose and need for this project is arbitrary and capricious and in violation of NEPA. The Tahoe must remedy this deficiency in a new NEPA analysis that adequately considers the full breadth of travel management decisions available.

## 3. INACCURATE "BASELINE" SYSTEM OR NO ACTION ALTERNATIVE

### a. *Baseline Fails To Disclose Routes Not Analyzed Under NEPA*

The Forest Service's identified "baseline" transportation system is inaccurate, constituting a violation of NEPA. An accurate accounting of the true extent of the existing, designated transportation system is a critical step in setting the appropriate baseline for analysis. "The environmental baseline is an integral part of an EIS, because it is against this information that environmental impacts are measured and evaluated; therefore, it is critical that the baseline be accurate and complete." *Or. Natural Desert Ass'n v. Shuford*, No. 06-242-AA, 2007 WL 1695162, at *4 (D. Or. June 8, 2007) (citing *American Rivers v. Fed. Energy Regulatory Comm'n,* 201 F.3d 1186, 1195 & n. 15 (9th Cir.2000)). Further, NEPA requires that agencies "present complete and accurate information to decision makers and to the public to allow an informed comparison of the alternatives considered in the EIS." *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005).

In the context of travel planning, recent case law in the Northern District of California instructs land management agencies that the baseline should clearly disclose and distinguish between official system routes that have been previously subjected to NEPA and user-created routes that arose as a result of a cross-country travel regime.[5] The Forest Service must provide an accurate accounting of the existing, open, designated system, so that decision-makers and the public understand what is contained in the baseline and can compare the action alternatives to the existing, designated system. The threshold for determining whether a route is part of the existing, designated transportation system *and* open to motor vehicle travel by the public should be consistent and rigorous.

The baseline transportation system should consist only of motorized system routes that are supported by prior NEPA analyses or decision documents that justify their inclusion on maps and in spatial databases or can be clearly documented as constructed prior to the passage of NEPA. The baseline existing, designated system should not contain ML 1 roads, all Maintenance Level 2 roads in INFRA that are listed as "intermittent term service" which is defined as a road which is closed to vehicle traffic between periods of use (the closed period must exceed one year) and those listed as "intermittent stored service" which is defined as a service road, closed to traffic decommissioned roads, user-created and/or unauthorized routes, routes only accessible through private property that have not obtained a right-of-way, routes suggested for addition that have not completed required mitigations, and routes converted from motorized to non-motorized because those routes have either never been subjected to NEPA or NEPA decisions were made that closed the routes to public use. Therefore, those routes do not comprise the status quo open, designated system, and must be analyzed on a site-specific basis within the action alternatives in order to add them to the designated system.

A significant discrepancy existed between what the Tahoe National Forest had called its "system" and the routes that are supported by appropriate documentation. In our scoping

---

[5] *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 2009 U.S. Dist. LEXIS 90016, at 43 (Sept, 29, 2009) (To fulfill NEPA's goal of providing the public with information to assess the impact of a proposed action, the "no action" alternative should be based on the status quo – with a full description of what the status quo is and how it was reached – and should be consistently used as the benchmark by which the various alternatives are compared.)

comments and DEIS comments, we requested, but did not receive, this documentation prior to the release of the FEIS. The Forest claims to have performed a comprehensive inventory of its past transportation decisions as part of the travel planning process, and as instructed by Travel Analysis.[6] Response 1.00-6 – "Between Draft and Supplemental Draft EIS the Forest conducted a comprehensive review of all of the existing roads and trails to verify their status in the National Forest Transportations System. Information sources included the last 15 years of NEPA decisions concerning roads and trails, the Rights-Of-Way Atlas, and the INFRA Database." We requested that the Tahoe National Forest include information in the FEIS identifying the specific documentation or evidence that supports the inclusion of all routes in the existing, designated transportation system. There is no NEPA documentation provided in the FEIS that supports any changes based on this research. Further, there is no map provided that shows the changes to the basic system as a result of this research. The alternative 1 map shows the results of the corrections, but not the corrections themselves.

Furthermore, a summary of mileage changes is not sufficient. Without knowing the NEPA reasons why a particular route was added to or dropped from the base system, it is impossible to know what the cumulative impacts are for maintaining or adding other routes that may be affected by the base route change. In addition, the NEPA reasons for a route given up to 15 years ago may no longer protect the resource based on intervening conditions since the original NEPA decision (climate change, wildlife corridor change, fires, invasive species, etc.). Furthermore, the NEPA review found only 20.7 miles of road that were recommended for decommissioning compared to 349.7 miles of roads that were to close a road or trail. These closed roads, in many cases, have continued to be used and must be analyzed to see what damage to resources is occurring.

This information should have been included and disclosed to the public in the NEPA analysis. Failure to do so has violated NEPA.

### b. The Baseline System Included Numerous Routes In Error

INFRA, the database used by the USFS to document and track its transportation system, is the only place where detailed information regarding the USFS road and trail system can be found in a single location. It is logical that this database be used as a starting point for travel planning, so long as inconsistencies between the database and other agency road documentation (such as GIS layers or prior NEPA decisions) are addressed and disclosed and appropriate documentation of route origin is also provided, as discussed in the prior section.  We included in our DEIS comments an Excel spreadsheet of roads in the INFRA transportation database from the Region 5 GIS Clearinghouse (sent, to The Wilderness Society) that INFRA indicates have, at some point in the past, been determined to be unnecessary or inappropriate for long-term public motor vehicle travel. These are roads that should not be listed as part of the baseline travel system of roads open for public motor vehicle use.

---

[6] FSH section 21.2 (2) (b) and (g): "For the part of the forest transportation system under analysis, produce an inventory of NFS roads and NFS trails [and] a summary of existing travel management decisions."

The Excel spreadsheet listed all roads that should NOT be included as part of the baseline system and that should not be designated for public long-term motor vehicle use or appear on the MVUM until they are analyzed as part of the Travel Management Planning process. These routes that were identified included the following from INFRA:

- The column labeled Route Status listed all roads that are designated in INFRA as "decommissioned" (defined as a route that was no longer needed and has been removed from service).[7] These roads should not be designated for public long-term motor vehicle use and appear on the MVUM because they are no longer system routes open to motor vehicles In order to add these routes to the official open system, the Forest Service must document its rationale as to why these routes are now needed as part of the NFTS and analyze the site-specific effects of opening the route to public use.

- The column labeled "Operating Maintenance Level" lists all of the roads that are labeled in INFRA as "basic custodial care (closed)" (defined as an intermittent service road closed to vehicular traffic). These roads should not be designated for public long-term motor vehicle use or appear on the MVUM without additional analysis and disclosure of impacts because they are not currently open to motor vehicles.

- The column labeled Service Life lists all of the roads that are labeled in INFRA as "short term service" (defined as a road for short term use—including temporary roads) and "intermittent term service" (defined as a road closed to vehicle traffic between periods of use; the closed period must exceed one year). Roads in these two categories were not constructed for long-term public motor vehicle recreation and should not be designated for public long-term motor vehicle use or appear on the MVUM without justification and environmental analysis and appropriate mitigation measures to ensure that they are brought up to the standard required for long term service roads. These routes should not be treated as open system routes merely because they exist on the ground or have been entered into INFRA. These routes should not be designated for public long-term motor vehicle use or appear on the proposed MVUM without adequate justification and environmental analysis.

We performed a comparison between the INFRA database for the Tahoe and spatial data provided to us by the Forest Service that corresponds to the system roads in each of the alternatives.  We found a number of inconsistencies between what was identified as a system route in INFRA and what was displayed as a system route on the alternatives maps (DEIS comments Appendix A) and disclosed these to the Forest Service during the comment period. We included Excel sheets in our DEIS comments in our appendix A.

We included 4 maps (Appendix A) that show these inconsistencies. It appears as if the Tahoe National Forest intends to designate hundreds of miles of roads that were never meant for this purpose, without any NEPA analysis or disclosure of the original intent of these roads to the public.  Addition of these routes in the ROD without the appropriate environmental analysis and public involvement is arbitrary and capricious and a violation of NEPA.

---

[7] All INFRA database definitions are from the Travel Routes National Data Dictionary, Roads, Infrastructure Application, Version 1.5, Nov. 2006.

### 4. INADEQUATE ANALYSIS OF DIRECT, INDIRECT, AND CUMULATIVE IMPACTS

NEPA requires federal agencies to assess the direct, indirect, and cumulative environmental impacts of proposed actions, taking a "hard look" at environmental consequences, and performing an analysis commensurate with the scale of the action at issue.[8] "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mt. v. United States Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998). Analysis of site-specific impacts must "contain a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). NEPA mandates a "hard look at a decision's environmental consequences." *Id.* An agency may not "rely upon forecasting difficulties or the task's magnitude to excuse the absence of a reasonably thorough site-specific analysis of the decision's environmental consequences." *Id.* at 765; *see also Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1357 (9th Cir. 1994) (holding site-specific analyses for approval of multiple sites required when the agency makes a "critical decision . . . to act on site development" (internal citations omitted)).

#### a. Project's Impacts To Environmental And Cultural Resources

As stated above, NEPA requires that the Forest Service take a hard look at the effects of the existing and proposed designated systems on natural and cultural resources. Though many of the routes contain comments about potential impacts to wildlife resources and air quality, no route analysis considers a change to the route location or elimination of the route.

Further, merely because the Forest Service proposes to replace a cross-country management regime with one that prohibits cross country travel does not mean that impacts of prior and proposed designations can be swept aside and only compared with the no-action alternative. As one court put it in the context of modestly improved fuel economy standards where the plaintiffs had urged more stringent standards:

> The only reason NHTSA provided for why the environmental impact of the Final Rule would be insignificant is that it results in a decreased rate of growth of [greenhouse gas] emissions compared to the light truck CAFE standard for MY 2007. But simply because the Final Rule may be an improvement over the MY 2007 CAFE standard does not necessarily mean that it will not have a 'significant effect' on the environment.

*Center for Biological Diversity v. HTSA*, 538 F.3d 1172, 1224 (9th Cir. 2008); *see also* 40 C.F.R. § 1508.27(b)(1) ("A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial."). Throughout the FEIS and ROD the Forest Service relies on generalized statements and averages to suggest that because it is closing the Forest to cross-country travel, there will be a net environmental benefit for all resources, ignoring the substantial and enduring effects the designated system will have on natural and cultural resources. In addition, the impacts of greenhouse gas emissions affecting climate change should be considered as a social impact and analyzed as such. *DEIS volume 3 page 719.*

---

[8] 40 C.F.R. § 1502.2 (b) and 1508.8

This failure to take a hard look at the impacts of the proposed action has also resulted in a violation of the Travel Management Rule, 36 C.F.R. 212, as is discussed in detail later in this appeal.  The travel management rule requires that the agency "shall consider effects on the following, with the objective of minimizing: (1) Damage to soil, watershed, vegetation, and other forest resources; (2) Harassment of wildlife and significant disruption of wildlife habitats; (3) Conflicts between motor vehicle use and existing or proposed recreational uses of National Forest System lands or neighboring Federal lands . . .." 36 C.F.R. § 212.55(b). Each route designation requires a detailed analysis of the effect of that designation on the above factors and for other issues raised by staff and the public during comment periods. The analysis should include an explanation of how that particular route minimizes or mitigates damage, harassment, and conflicts.  Failure to do so is arbitrary and capricious and in violation of law.

### b.   Ongoing Environmental Impacts Of The Existing System

The Tahoe FEIS makes a fundamental error by placing existing system routes outside of the present environmental analysis. To justify this action, the Forest relies mistakenly on Travel Management regulations which state that the "responsible official may incorporate previous administrative decisions regarding travel management made under other authorities, including designations and prohibitions of motor vehicle use, in designating National Forest System roads, National Forest System trails, and areas on National Forest lands for motor vehicle use under this Subpart."[9] (FEIS Appendix N page 23). However, this regulation does not absolve the Forest Service of disclosing the direct and indirect effects of existing system routes or the cumulative effects of the entire system.

The Forest Service, by placing these routes on an MVUM as open to motorized use, is taking an action to allow continued motorized use on these routes.  While the TMR allows the Forest to carry forward designations made previously, it does not relieve the Forest Service of its obligations under NEPA to analyze and disclose the effects of those earlier designations in the context of this forest-wide travel management plan.  In addition, the TMR also does not relieve the Forest from the obligation to re-analyze designations if there are significant changed circumstances.  Because many of the routes that we suggested should be considered for removal from the system were causing resource impacts, it would follow that there have been significant changes in circumstance.  Without taking a serious look at its existing system before placing the routes on the MVUM, the Forest Service failed in its NEPA duty to evaluate the impacts of a proposed action. The Forest Service must disclose whether or not it has taken this requirement into account when it chooses to place any route on the MVUM, and failure to do so is a violation of NEPA.

The FEIS should also analyze the entire TNF transportation system sufficiently (as required under sub-part A) to determine an acceptable Forest-wide mileage density, and route suitability, based on resource capability zones and/or sensitivity to various forms and volumes of traffic, and allocate mileage accordingly. Frequency thresholds of motorized traffic based on zoned levels of sensitivity, (or some other spatially delimited ecological indicator) should be established and

---

[9] 36 C.F.R. 212.50 (b) "Scope".

declared in the FEIS. Imposition of traffic frequency control through a permit process should be thoroughly addressed and evaluated in the FEIS.

Environmental impacts occur in spatial, not linear, patterns. This is because resource attributes, the attributes assumed to be subject to impacts from motorized traffic, are two-dimensional (i.e. spatial). Roads and trails are, on the other hand, essentially one dimensional (route width being for, our purposes, a nominal constant), linear features. Route allocation should be driven by capability of **areas** of the forest to support traffic, not by an analysis of the impacts of 22,000 line segments as is attempted here.

Moreover, to the extent the Forest Service is attempting to tier to previous environmental analyses associated with prior designations, it must do so explicitly and make the prior NEPA analysis part of the project record and readily available to the public.[10]  Finally, if a past decision cannot be identified where the designated routes were analyzed, or if circumstances have changed since those routes were analyzed, the environmental effects of that route must be analyzed in the present NEPA process.

Any analysis that was completed at the time of route construction would likely be inadequate due to lapse of time since that analysis and other changed circumstances such as recently protected species, proliferation of user created routes, effects of climate change, etc. The effects of these existing system routes must be analyzed and disclosed in a new NEPA analysis.

### c.   *Cumulative Effects Of The Entire Transportation System*

By not conducting travel analysis or otherwise considering the environmental impacts of the entire transportation system, the FEIS assessment of cumulative impacts is deficient under NEPA.  As defined by the CEQ regulations:

> "Cumulative impact" is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R § 1508.7.  In the context of travel management planning, courts have held that proposals to designate additional routes for motorized recreation must be viewed in light of the entire transportation system. In other words, the impacts of all routes must be analyzed:

> Within the NEPA scheme, any proposal adding to this ORV system . . . must be examined in light of the entire existing system." *North Cascades Conservation*

---

[10] Despite multiple requests from the public, the agency has provided no record of previous administrative decisions regarding travel management upon which it is relying for either "incorporating previous administrative decisions" or tiering to for environmental analysis. Even if we had received records of previous administrative decisions regarding travel management, this does not relieve the Forest from analyzing the effects of these routes on social, cultural, and natural resources during this NEPA process.

*Council*, 98 F. Supp. 2d 1193, 1198 (W.D. Wash 1999). It also still holds true that "the impact of the existing system, and whether it can bear an increase in use, has never been carefully considered," and that "[w]ithout examining the ORV trail system, the Forest Service cannot meaningfully measure cumulative environmental impacts in the fashion that NEPA requires." *Id.* at 1199.

*The Mountaineers v. USFS*, 445 F. Supp. 2d 1235, 1248 (W.D. Wash 2006).

The Forest Service failed to meet this basic requirement of NEPA.  Because the FEIS places existing routes outside of its impacts analysis, and because the Forest Service could not (or would not) provide any documentation of the NEPA analysis that had been completed for the existing routes, it seems evident that few existing routes have ever been subject to NEPA analysis for impacts to the natural and cultural resources or climate change, and their cumulative effects have never been considered. Furthermore, as described previously, existing circumstances have changed greatly since these routes were first constructed and an appropriate environmental analysis of this project would include a re-evaluation of the impacts from and necessity for these existing routes.

The transportation system was created in a piecemeal fashion over many years and the Forest Service should have taken a hard look at the cumulative effects of its road system in this process. Existing motorized routes, both system and unauthorized, have negative impacts to natural resources and will continue to cause resource damage that, when taken with other Forest Service actions and existing routes that remain on the ground even if they are not designated as open to motorized use, are cumulatively significant. Even routes that were subjected to NEPA analysis when they were built must now be reanalyzed for their cumulative effects on the landscape and how the landscape has changed since those routes were constructed.  There is no evidence within the FEIS that this cumulative effects analysis was done, only cursory assertions that the impacts were considered.

The cumulative impacts analysis is also deficient with respect to the impacts from illegal motorized recreational use.  Even though the Forest Service has decided not to designate many miles of user-created roads, these routes and their associated impacts have not disappeared. Routes that were not incorporated into the system and have not been obliterated will undoubtedly continue to experience illegal use and continue to have negative consequences for the environment.  Even if illegal use does not continue, the physical presence of the route on the ground still has an impact on the resource.  The Forest Service must consider the cumulative impacts of the illegal use of these routes in addition to the use of the additional system routes designated in this Project. *See Sierra Club v. Bosworth*, 352 F. Supp. 2d 909 (D. Minn. 2005). The Tahoe National Forest similarly erred when it failed to consider the cumulative effects of reasonably foreseeable illegal activity. *The Mountaineers*, 445 F. Supp. 2d at 1248 (internal citations omitted).

In addition, the cumulative impacts analysis is deficient because there is <u>no</u> consideration that there are likely to be new, more powerful, and louder types of motorized recreational use in the future.  For example, more powerful ATVs would have a greater capacity to cause soil erosion, which has impacts to water quality.  Louder ATVs would have a greater capacity to have noise

impacts in the IRAs.  As in prior projects, "[i]t still holds true that 'the impact of the existing system, and whether it can bear an increase in use, has never been carefully considered.'" *Id*.

Further, the assumption that one size of motor vehicle impact fits all conflicts with the acknowledgement that, in general, impacts from all classes of motor vehicle are unknown. In addition, Delaney and Grubb (2003) found that spotted owl responses to motorcycle noise depended upon an array of complex factors, including sound level and frequency distribution, stimulus distance and event duration, ***motorcycle type and condition***, frequency of motorcycle events, number of motorcycles per group, trail slope, topography, road substrate and condition, and microphone position relative to sound source. (DEIS Vol.3, page 249 (Emphasis added).

(DEIS Vol.3 pages 144-145) states: "Route density thresholds for wildlife have not been established on the Tahoe NF, and thresholds for wildlife in the literature can vary by season and by geographic location. Therefore, road density "thresholds" will not be used to determine effects of the project alternatives, but rather road density is used for a relative comparison of the alternatives." This comment illustrates the Forest Service abdication for providing an adequate analysis of existing and future routes. No quantified threshold is declared.

Over 400 short routes for dispersed camping were added to the preferred alternative in the SDEIS. We see no analysis of the cumulativeeffects of the adding of all of these dispersed camping routes.

Because the Forest Service failed to consider the environmental impacts and cumulative effects of the entire transportation system the FEIS and ROD are deficient under NEPA. The Forest Service must correct this deficiency in the analysis.  For all of the resources impacted by the Project, the cumulative impacts of the Forest Service's actions must be viewed as a product of: (1) the baseline impact caused by the pre-existing designated route system; (2) the added impact caused by illegal user-created routes, over time; (3) the short and long-term impacts caused by the persistence of all of these routes on the landscape now; (4) the impacts caused by lawful use of the designated route system coupled with potential unlawful use of the undesignated route system; and (5) the impact caused by past, present, and reasonably foreseeable future actions. Only by combining the past, present, and future impacts of illegal use with the impacts of authorized road use (on federal and non-federal lands) can the true impacts of this Project be evaluated and understood.

### d. Noxious Weeds

The ROD for the Tahoe Travel Management EIS adds 61.4 miles of unauthorized routes to the NFTS and designates an additional 130.8 miles of ML-3 roads for mixed-use and 122 miles of ML-3 roads downgraded to ML-2. This action violates Executive Order 13112, the National Forest Management Act (as described below) and Forest Service Manual (FSM) 2081.03. Deficiencies in the FEIS violate NEPA. These violations of law must be remedied in a new decision that fully considers all impacts from the action.

The FEIS and ROD violate Executive Order 13112, which directs Federal agencies to **prevent introduction** of invasive species, **detect** and **respond rapidly** to and **control** such species, **not authorize, fund or carry out actions likely to cause or promote introduction or spread of**

18

**invasive species** unless the agency has determined and made public its determination that the benefits of such actions clearly outweigh the potential harm caused by invasive species; and that **all feasible and prudent measure to minimize risk of harm will be taken** in conjunction with the actions. (FEIS, p. 585) (Emphasis added).

Table 3.06-3 shows that cheatgrass, spotted knapweed, yellow star thistle, scotch broom, French broom, tall whitetop, Himalayan blackberry, and Spanish broom rate as high by the California Invasive Plant Council on TNF System Lands (FEIS chapter 3 page 589). It also states: "Another aspect of motorized vehicle use that helps to spread the weeds is tied to the use of recreational areas and facilities, such as trailheads, campgrounds and dispersed camping areas". Over 400 short routes were added to the preferred alternative in the SDEIS. Though analysis of the 400 routes indicates rare plants may be present, the analysis does not refer to the invasive plant issue and no mitigation is recommended. For non-dispersed routes, the only mitigation that is recommended is: "Instruct users and maintenance crews in weed identification so early detection and eradication of aggressive weeds can occur early."

Despite these acknowledgements that this project will result in the spread of noxious weeds, the ROD includes no determination that the benefits of this action outweigh the potential harm caused by invasive species. Consequently, the ROD is in violation of the E.O. and the failure to disclose these impacts is in violation of NEPA.

The ROD and FEIS violate Forest Service Manual (FSM) 2081.03, which requires that a weed risk assessment be conducted when any ground disturbing activity is proposed.  A weed risk assessment determines the risk of introducing or spreading noxious weeds associated with the Proposed Action.  Projects having moderate to high risk of introducing or spreading noxious weeds must identify noxious weed control measures that must be undertaken during project implementation.

These violations of law must be remedied in a new decision.

###### e. *Climate Change*

<u>Background</u>

The warming of our climate system is unequivocal.[11] There have been significant increases in global average air and ocean temperatures, widespread melting of snow and ice, and rising global average sea level.  Eleven of the past twelve years rank among the warmest in the instrumental record of global surface temperature, and it is likely that average temperatures in the Northern Hemisphere have been the highest in at least the past 1,300 years.  Satellite data since 1978 show that Arctic sea ice is shrinking at a rate of 2.1-3.3% per decade, with even larger declines in

---

[11] Climate Change 2007: Synthesis Report – Summary for Policymakers, International Panel on Climate Change, page 2; Technical Report Document for Endangerment and Cause or Contribute Findings for Greenhouse Gases under Section 202(a) of the Clean Air Act. Climate Change Division, Office of Atmospheric Programs, U.S. Environmental Protection Agency, Washington, D.C.  April 17, 2009, page ES-2; Proposed Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 2023(a) of the Clean Air Act; Proposed Rule. 78 Fed. Reg., 18896 (April 24, 2009).

summer sea ice.[12]  The National Snow and Ice Data Center ("NSIDC") reports that in 2006, Arctic ice had diminished to its all time lowest recorded level.   They further report that sea ice extent averaged over the month of March 2009 was 5.85 million square miles. This was 282,000 square miles above the record low of 2006, but 228,000 square miles below the 1979 to 2000 average.  Air temperatures over the Arctic Ocean were an average of 1.8 to 3.6 degrees Fahrenheit above normal, and sea ice older than two-years reached record lows.[13]  In April 2009, the Wilkins Ice Shelf destabilized and collapsed, leading researchers to state that, "There is little doubt that these changes are the result of atmospheric warming on the Antarctic Peninsula, which had been the most rapid in the Southern Hemisphere".[14]  The inescapable fact is that global warming and climate change now presents a dire situation for life on Earth, and as a major emitter of GHGs, the United States must act quickly and deliberately, using any and all the tools at its disposal to eliminate or reduce the dangers to human health and the environment.

In its recent Endangerment and Cause or Contribute Findings, the EPA has explicitly acknowledged that climate change resulting from elevated GHG levels would result in human health risks such as heat-related mortality, exacerbated air quality, aggravated risks for respiratory infection, aggravation of asthma, and potential premature death for people in susceptible groups.[15]  The World Health Organization has estimated that as of the year 2000, 154,000 deaths and the loss of 5.5 million daily adjusted life years per year worldwide were already attributable to global warming.[16]  The Scientific Assessment of the Effects of Global Change on the United States devotes an entire chapter on the significant impacts of climate change on human health.  The impacts can be characterized as stemming from: temperature effects; extreme events such as storms, wildfires and droughts; climate-sensitive infectious diseases; aeroallergens (pollens); and, reduced air quality.[17]

The impacts to species and biological diversity are likewise severe. In a study published in *Nature* in 2003, Parmesan and Yohe reported a "globally coherent fingerprint of climate change impacts across natural systems."[18]  In documenting this "fingerprint" of global warming on ecosystems, scientists have predicted three categories of measurable impacts from recent warming: (1) earlier timing of spring events and later autumn events (*i.e.*, changes in "phenology"), (2) extension of species' range poleward or upward in elevation, and (3) a decline

---

[12] Climate Change 2007, page 2.

[13] Arctic sea ice younger, thinner as melt season begins, April 6, 2009, from http://www.nsidc.org/arcticseaicenews/ (last accessed April 30, 2009); J. Richter-Menge et al, 2008.  Arctic Report Card 2008, Sea Ice, from http://www.arctic.noaa.gov/reportcard/seaice.html (last accessed April 30, 2009).

[14] European Space Agency, April 29, 2009.  Satellite imagery shows fragile Wilkins Ice Shelf destabilized.  Science Daily. Retrieved April 30, 2009, from http://www.sciencedaily.com/releases/2009/04/090428154833.htm .

[15] 78 Fed. Reg., 18893-18894,  18901-18902.

[16] World Health Organization, 2002.  The World Health Report 2002, from http://www.who.int/whr/2002/en/index.html .

[17] Scientific Assessment of the Effects of Global Change on the United States, May, 2008.  A Report of the Committee on Environment and Natural Resources, National Science and Technology Council, pp. 167-183. Available at: www.climatescience.gov/Library/scientific-assessment/Scientific-AssessmentFINAL.pdf .

[18] Parmesan, C. and G. Yohe. 2003. A Globally Coherent Fingerprint of Climate Change Impacts Across natural Systems.  Nature 421:37-42.

in species adapted to cold temperatures and an increase in species adapted to warm temperatures.[19]

We include this background as context for our assertion that the Forest Service was wrong not to disclose both the effects of the motorized travel plan on climate change in terms of the emissions that result from use of the motorized system and the effects of climate change on natural resources within the project area, particularly when considered in conjunction with the impacts the motorized travel system on those same resources.

> Failure to Analyze and Disclose the Impacts and Cumulative Effects to and from Climate Change As a Result of the Proposed Action

Several courts have ruled that federal agencies must take into account the cumulative impacts of climate change.  For example, in *Center for Biological Diversity v. National Travel Safety and Highway Administration* 508 F.3d 508 (9th Cir. 2007), the U.S. Court of Appeals for the Ninth Circuit held that environmental impacts from setting CAFE standards for light trucks had reasonably foreseeable and cumulatively significant impacts on public health and safety from climate change to require a full NEPA analysis by the National Travel Safety and Highway Administration.  Key holdings applicable to land management agencies in this case include:

- Agency actions that have small or incremental impacts on global climate change and/or the environment, like greenhouse gas emissions, must be evaluated. *Id.* at 549.
- Agencies must consider mitigation options for emissions and the economic benefits such actions could have in the range of alternatives presented in an EIS. *Id.* at 551-552.
- Agencies cannot limit the scope of their NEPA obligations to prevent them from considering alternatives that could mitigate climate change by perceiving constraints in another statute. *Id.*

The FEIS does not consider or disclose the potential consequences of motorized recreation in the Forest as it pertains to both increased carbon from vehicle emissions and ecosystem disjunction where a natural area is bisected by a road or motorized trail.

Instead, without disclosing or examining information about the effects of climate change in the area, the FEIS proposes a mix of actions that would compound the deleterious effects of a warming climate. In this regard, the Forest Service's failure to consult the scientific literature resulted in a flawed document that has insufficient options for addressing a significant impact that will likely have systemic effects throughout the Forest.[20] The Forest Service should have drawn on EPA's research and consulted with EPA staff whose report "provides information on how existing practices could be adjusted or new strategies developed, to address the effects of climate change on natural resources."[21] According to the report, these strategies involve increasing the resilience of ecological systems to climate change.

---

[19] Parmesan, C. and G. Hector. 2004.  Observed Impacts of Global Climate Change in the U.S.  Prepared for the Pew Center on Global Climate Change.
[20] U.S. Climate Change Science Program Final Report, Synthesis and Assessment Product 4.4, Preliminary Review of Adaptation Options for Climate-Sensitive Ecosystems and Resources 9-14 (June 2008), http://www.epa.gov/ord/npd/pdfs/gcrp-factsheet_SAP-4-4.pdf .
[21] EPA, Global Change Research Program, Science in Action: Building a Scientific Foundation for Sound Environmental Decisions, *Assessment Provides Strategies for Managing Natural Resources in a Changing Climate:*

The FEIS ignores the gravity of the threat of climate change to life within the planning area, and fails to take a hard look at the impacts this project will have as related to those effects.  The Forest's failure to address these known and critically important environmental consequences violates NEPA.  Federal agencies' mandatory duty to take a hard look at the ongoing impacts of global warming in NEPA documents has been affirmed by the courts.  As the Ninth Circuit has recognized:

> Global warming has already affected plants, animals, and ecosystems around the world.  Some scientists predict that 'on the basis of mid-range climate-warming scenarios for 2050, that 15-37% of species in our sample of regions and taxa will be 'committed to extinction.''  In addition, there will be serious consequences for human health, including the spread of infectious and respiratory diseases, if worldwide emissions continue on current trajectories.  Sea level rise and increased ocean temperatures are also associated with increasing weather variability and heightened intensity of storms such as hurricanes.  Past projections have under-estimated sea level rise.  Several studies also show that climate change may be non-linear, meaning that there are positive feedback mechanisms that may push global warming past a dangerous threshold (the 'tipping point').

*See CBD v. NHTSA*, 538 F.3d at 1190-91 (citations omitted).  Global warming's well-established impacts on resources including air quality, water quality, and imperiled plants and animals will combine with and exacerbate the direct, indirect, and cumulative impacts of motorized recreation, but the FEIS never addresses this critically important aspect of the problem.

Guidance issued by the Forest Service on incorporating climate change analysis into its project level NEPA documents confirms that further analysis should have been included in the FEIS. This guidance provides that:

> Many proposed projects and programs will emit greenhouse gases (direct effect) and, thus, contribute to the global concentration of greenhouse gases that affect climate (indirect effect). Quantifying greenhouse gases emitted and/or sequestered may help choose between alternatives based on relative direct effects trade-offs.  Climate Change Considerations in Project Level NEPA Analysis, issued January 13, 2009 p. 4.

In October 2008, the Forest Service released the *Forest Service Strategic Framework for Responding to Climate Change (Vol. 1.0).* The document is intended to provide "a strategic framework for the Forest Service to guide current and future actions to meet the challenge of climate change." (p. 2). The framework established seven goals to help the Forest Service preserve forests and grasslands as the climate changes, including "Adaptation" and "Mitigation" (p. 7). The "Adaptation" goal states that the Forest Service will "[e]nhance the capacity of forests and grasslands to adapt to the environmental stresses of climate change and maintain ecosystem services." (p. 7).  The "Mitigation" goal states that the Forest Service will "[p]romote the

---

*Findings of the U.S. Climate Change Science Program Synthesis and Assessment Product 4.4* at 2, *available at* http://www.epa.gov/ord/npd/pdfs/gcrp-factsheet_SAP-4-4.pdf.

management of forests and grasslands to reduce the buildup of greenhouse gases, while sustaining the multiple benefits and services of these ecosystems." (p. 7).

Building on this Strategic Framework, the Forest Service released its National Roadmap for Responding to Climate Change in July 2010. The document includes a range of short, medium, and long-term initiatives to respond to climate change. The framework contains ten elements in four dimensions that the Forest Service will be held accountable for implementing. (p. 3)  The agency's efforts to achieve the ten elements to respond to climate change will take three types of action: Assessing, Engaging, and Managing. (p. 4). Several initiatives relating to the Managing Actions are relevant here. Initiatives that the Forest Service should take immediately include "Develop new management strategies for reconnecting habitats, maximizing the habitat accessible to native species while minimizing the spread of unwanted species."[22] Other initiatives that the Forest Service recognizes should be implemented immediately regarding the importance of connecting habitats to improve adaptive capacity. Specifically, the Roadmap includes the following:

- "Remove or modify physical impediments to the movement of species most likely to be affected by climate change.
- Manage forest and grassland ecosystems to decrease fragmentation.
- Continue to develop and restore important corridors for fish and wildlife."[23]

The FEIS (page 52) ignores this direction when it argues that "Because greenhouse gases from vehicle emissions mix readily into the global pool of greenhouse gases, it is not currently possible to discern the effects of this project from the effects of all other greenhouse gas sources worldwide, nor is it expected that attempting to do so would provide a practical or meaningful analysis of project effects. Potential regional and local variability in climate change effects add to the uncertainty regarding the actual intensity of this project's effects on global climate change."

This attempt to hide behind uncertainty is arbitrary and capricious. Impacts of global warming have been predicted with a high degree of both certainty and precision, providing the Tahoe National Forest more than adequate information to analyze and disclose the carbon footprint of the proposed action, as well as the other alternatives, and their contribution to global warming. In addition, the likely impacts of global warming on resources including air quality, water availability, and to imperiled plants and animals, and how this decision would compound those impacts, could have and should have been analyzed. Several recent reports[24] from high-ranking

---

[22] USDA Forest Service National Roadmap for Responding to Climate Change p 27. July 2010.

[23] Roadmap p 27 - 28.

[24] Scientific Assessment of the Effects of Global Change on the United States, May, 2008.  A Report of the Committee on Environment and Natural Resources, National Science and Technology Council.  Available at: www.climatescience.gov/Library/**scientific-assessment/Scientific-Assessment**FINAL.pdf .

The Effects of Climate Change on Agriculture, Land Resources, Water Resources, and Biodiversity in the United States. May, 2008.  Synthesis and Assessment Product 4.3.  Report by the U.S. Climate Change Science Program and the Subcommittee on Global Climate Change Research.  Available at: http://www.climatescience.gov/Library/sap/sap4-3/final-report/default.htm .

U.S. science groups provide factual findings regarding the social and environmental impacts resulting from increased GHG emissions and climate change.

The Tahoe National Forest FEIS makes no attempt to make a reasonable, science-based assessment of the impacts of climate change on the Forest, nor how it is implementing, or why it is not implementing, the above-mentioned goals through this project. At a minimum, a description of the effects of climate change on existing conditions provides critical baseline information necessary to the Forest Service's ability to determine whether public land resources can withstand any of the proposed management alternatives, including the new miles of roads. This existing condition includes, but is not limited to, the prevalence of exotic plant species, the availability of water and the health of riparian areas, zones of soil erosion or vulnerability to erosion, and levels of habitat connectivity. Without this basic foundational information about the existing impacts of climate change on the land, and future expected impacts, it is impossible to make informed decisions about the level, location, and kind of activities the land and its ecosystems can support in the future.

Given the tremendous significance and far-reaching implications of these analyses and conclusions, and the direct relevance of this information to the ROD, it is arbitrary and capricious to ignore the conclusions of these and other recent reports in the FEIS.

### f.  Terrestrial Wildlife

The analysis of the effects of adding unauthorized routes to the Forest transportation system and designating all existing system routes for motorized travel is neither scientifically valid nor in compliance with federal regulations. The proposed action would add 61.4 new roads/routes to the transportation system—roads/routes which almost all pass through sensitive wildlife habitat including habitat for wolverine, deer winter and summer range, mountain quail, closed canopy habitat for marten and spotted owl, sooty (blue) grouse, great gray owl, and Pacific tree frog habitat, carnivore network, bald eagle nest site, and yellow-legged frog and fox sparrow habitat.None of these routes were examined for an modification of the route or closing of the route . No mitigation measures were imposed. Furthermore, the FEIS relies on the new MIS rule to evaluate which species are to be examined. This rule is under appeal in Federal courts. The Forest Service should take a precautionary look at the MIS species that are in the current TNF Land management plan before approving any particular route.

**From Appendix A 3.03-20 Terrestrial and aquatic species (existing motorized trail system):**
>  Wildlife and habitat impacts for the alternatives are based on comparison between the action alternatives and the No Action Alternative. This comparison does not address the impacts of the existing system on wildlife and habitats.
>  **Response:** Chapter 3.03 (Terrestrial and Aquatic Species) of the FEIS analyzed impacts of the existing motorized system in the cumulative effects analysis for terrestrial and wildlife species. Summary tables in the FEIS have been simplified to more cogently show differences among alternatives.

---

Global Climate Change Impacts in the United States. June, 2009. Thomas R. Karl, Jerry M. Melillo, and Thomas C. Peterson, (eds.). Cambridge University Press, 2009.  Available at: http://www.globalchange.gov/publications/reports/scientific-assessments/us-impacts/download-the-report .

The Terrestrial and Aquatic analysis repeatedly compares the preferred alternative to the existing system including all of the illegal cross-country routes. Not surprisingly, the selected alternative comes out as better. But it does not analyze the existing system without the illegal cross-country travel to determine problems with the current routes.

NEPA requires a comparison and analysis of the direct and indirect effects *among the alternatives*, not against a background of all natural and human-caused events. In fact, the background natural events and management activities such as timber harvesting provide evidence that the cumulative effects of these individual impacts can be great—and any additional impacts will only add to the natural and anthropogenic stressors that wildlife face every day.

In addressing cumulative impacts, the biologist writes: "Since the cumulative effects of noise and other disturbances to wildlife associated with motorized use were modeled and analyzed using maps of existing vegetation and the existing motorized routes across the entire TNF in the FEIS, the incorporation of past projects within maps of existing vegetation and existing motorized routes, is appropriate and relevant in the determination of cumulative impacts to wildlife." This emphasizes that no on-the-ground work was performed, and only the effect of routes that are being added to the system was analyzed. The entire designated system must be evaluated to determine the full effects of the action. There is no indication that the effect of the motorized use of the route was analyzed; only the existence of the route was noted.

The Forest has also failed to follow regulations related to wildlife protection. The Sierra Nevada Forest Plan Amendment (SNFPA) requires the Forest to "evaluate proposals for new roads, trails, off-highway vehicle routes, and recreational and other developments for their potential to disturb nest sites…and den sites" of fisher, marten, spotted owl and goshawk (management Standards and Guideline 82). The FEIS failed to produce any mitigations for impacts to specific nest and den sites. In fact, not a single unauthorized route was field checked for wildlife conflicts. It only indicates the presence of species or their habitats, not impacts to them. The FEIS should show that the Forest has fully reviewed the literature on the issue of wildlife/traffic interaction and that it has followed the principle of "deference toward caution in the absence of sufficient data" in formulating the proposed preferred action plan.

The Forest also failed in the FEIS to follow the requirement under Subpart B of the Travel Management Rule to "consider effects on the following with the objective of minimizing: . . . harassment of wildlife and significant disruption of wildlife habitats."[25] The Forest did not explain the criteria for minimizing the effects on wildlife or analyze how each alternative met or did not meet that requirement. The NFTS contains approximately 3,226 miles of NFS roads (enough to go from San Francisco to Key West Florida), of which 2,395 miles are open to public use (page 1 ROD).  The Forest has failed to justify its decision to keep existing routes on the system and to add new roads to this already large route network, given the requirements to minimize impacts to wildlife and the lack of demonstrated need for this extensive mileage of routes.

---

[25] 36 C.F.R. 212.55 (b)

The Tahoe NF falls within an area considered to be a distribution gap within the range of the fisher (Zielinski et al. 2005). (DEIS Vol. 3, page 286). We find it difficult, therefore, to understand the present effort to commit forest lands to motorized traffic (i.e. the present OHV motorized trail designation program) ***prior*** to identifying areas to be set aside to ensure ecosystem integrity. The proposed sequence appears to represent a profound confusion of priorities. That is, long-term strategic planning, including the identification of measures protecting ecosystem (region-wide) integrity, does not properly <u>follow</u> the designation of motorized trails as proposed here. Rather, long-term planning for ecosystem integrity naturally and necessarily <u>precedes</u> local designation of motorized trail mileage. **Establishment of wildlife corridors, at least in concept, should occur before any land is committed to another conflicting use.** (Forest issues Group comments on OHV proposal, 12/09/2006)

Criteria for defining other zones (other than North-South habitat corridors) should include the vast amount of attribute data in the TNF database including inventoried reserves for sensitive species (e.g. goshawk, spotted owl, frogs), the forest carnivore network, elevation, existing road density, topography, old forest emphasis areas, and so forth.

Indeed, under the Selected Alternative, over 83 percent of the Tahoe National Forest will be within ½ mile of an authorized road or motorized trail. Approximately 78 percent of the Forest will be within ½ mile of a road open to motorized travel under this decision. Clearly, the NFTS resulting from this decision shows the emphasis that has been placed on providing public access to the Forest (ROD page 13). Of the remaining 17%, almost all is within Inventoried Roadless Areas. What hasn't been shown is that this extensive network meets the requirements of a "minimum" road system as required under SubPart A.

### g.  *Soils And Hydrology*

The NEPA analysis for this project is flawed because it fails to adequately analyze the impacts to soils and hydrology from the designated route system.  Nowhere in the FEIS or supporting documents is there a route-specific analysis of the routes and their potential impacts to soil or water quality or otherwise adequate disclosure of impacts to the resource. Instead, the public is expected to blindly accept the FEIS assertion that all proposed routes were screened through a multi-layer analysis, and only those that didn't have any resource issues were included in Modified Alternative 6. NEPA requires that screening to be available for public review and comment. The FEIS instead refers the reviewer to Appendix A: Route Analysis, which is not an analysis at all. It is a textual explanation with little scientific data.

The Soil Resources chapter points out the need for disclosure of route-specific impacts: "Using the soil erosion risk ratings found in the Soil Resource Inventory (See Table 3.02-8), 82 percent of the Forest has a high to very high erosion hazard." (SDEIS Page 101 Yet the Appendix A route analysis for Route D_86 states: "**Resource Information**: Route is on CEE soils which are deep soils developed from glacial deposits. 15% of the area has shallow to moderately deep, very poorly drained soils in drainageways and on valley floors with *Carex* spp., *Juncus* spp., alder, willow and aspen vegetation. **Mitigation Measures Required**: None". This is typical of the analysis for designated routes.

26

NEPA requires analysis of the impact of changing routes from maintenance level 3 to maintenance level 2 roads/routes for OHV use. The SDEIS declares: "**Change Vehicle Classes through Maintenance Levels:** Changing vehicle class on 122.0 miles, to allow operators of non-highway legal vehicles to operate on NFTS roads where such use is currently prohibited through the conversion of ML 3 roads to ML 2, would have minimal effects to soil resources. These are pre-existing routes so the loss of productivity has already occurred. As designated routes within the NFTS these routes would be subject to FS standards SDEIS Page 111)." But it also declares: "Native surface motorized roads and trails generally have a higher risk of concentrating road runoff and surface erosion and increased erosion adjacent to the route than surfaced routes and are considered higher risk routes." (SDEIS page 96).

Use of OHVs on native surfaced roads has impacts to soils and hydrology far beyond that which occurs as a result of street-licensed only use. The level and type of use directly affects erodibility. OHV trails are subjected to more intensive traffic-induced sediment detachment processes than roads. Foltz found hydraulic conductivity generally decreases with increasing level of disturbance class and that interrill erodibility generally increases with increasing level of disturbance. These factors can increase the erodibility of the trail surface by almost more than an order of magnitude relative to forest roads (Foltz, 2006).[26]

The designation and mapping of unauthorized routes will increase the use of those routes, thereby increasing negative impacts, including erosion.  There is no discussion of this in the EIS documents. They also lack language that assures the planning and implementation for removal and/or restoration of routes that are not designated.  Given the lack of USFS funding for law enforcement, use on unauthorized routes would continue, and impacts to soil resources from OHV use will continue on these non-designated routes.

NEPA requires an analysis of the routes proposed for mixed use. The *DEIS volume 1 page 7* states: "Compaction and erosion are the primary effects of OHV use on soils". Yet later it states on *page 29* "Direct impacts to soils that result from this project are limited. There are no new ground disturbing activities proposed with this project. The roads and trails being evaluated in this analysis already exist on the ground. They are compacted and generally lack vegetation." There should be an environmental impact analysis done on downgrading road surfaces for mixed use, concerning erosion, culverts, etc. These roads should have been analyzed for the additional impact of OHV use. Without the required analysis of how the additional and different vehicle use will affect these roads, there is no justification for simply concluding there will be no additional impact.

There is no traceable connection between resource attributes and type and level of permitted use. (A possible exception is the hydrology modeled in EMDS, although even this exercise is somewhat difficult to track, because assignment of fuzzy attribute values to bits and pieces [300 foot bits] of route [**linear** features] does not provide solid support for evaluation of environmental impacts, expressible only **spatially**). One cannot easily determine why a segment (or more importantly a meaningful length of trail or road) is included or excluded. This leaves the public (and project designers) with no way to evaluate the effectiveness of the proposal or to

---

[26] Foltz, R.B. 2006. Erosion from all terrain vehicles (ATV) trails on national forest lands. ASABE Paper No. 068012. St. Joseph, Mich.: ASABE.

identify and mitigate specific issues with, for example, specific route allocations, or with specific spatial areas of concern. For example elevation is an ecologically important attribute: higher elevation parts of the system (represented spatially) are more sensitive to perturbation then lower elevation parts. That is, higher elevations (represented spatially) should have tighter seasonal restrictions commensurate with their increased level of resource sensitivity. Assigning values to line segments across the Forest cannot account for this.

As described in the preceding subsections, the FEIS is devoid of analysis that would constitute the "hard look" at effects on a variety of resources. We remind the agency that NEPA is not simply an exercise in which the Forest Service can "check off" a list of required analyses. Proper completion of NEPA should result in a "hard look" at the effects of a project on various natural and cultural resources and disclosure of these findings to inform the public and the decision maker about the consequences of the action. As the Ninth Circuit recently described:

> [B]y requiring agencies to take a "hard look" at how the choices before them affect the environment, and then to place their data and conclusions before the public, *see Or. Natural Res. Council Fund v. Goodman,* 505 F.3d 884, 889 (9th Cir.2007), NEPA relies upon democratic processes to ensure-as the first appellate court to construe the statute in detail put it-that "the most intelligent, optimally beneficial decision will ultimately be made." *Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n,* 449 F.2d 1109, 1114 (D.C.Cir.1971). "NEPA's purpose is not to generate paperwork-even excellent paperwork-but to foster excellent action." 40 C.F.R. § 1500.1(c).

*ONDA v. BLM*, 531 F.3d 1114, 1120 (9th Cir. 2008). Unfortunately, based on the Forest Service's failure to adequately analyze the effects of the project on the previously described resources, the agency has failed to meet its basic obligations under NEPA.


## B.  THE ROD AND FEIS VIOLATE THE CLEAN WATER ACT AND FAIL TO TAKE A HARD LOOK AT WATER IMPACTS IN VIOLATION OF NEPA

The objective of the Clean Water Act (CWA) is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this objective, the CWA authorizes each state to develop water quality standards ("WQS"). *Id.* §§ 1311(b)(1)(C), 1313. "A [WQS] defines the water quality goals of a water body, or portion thereof, by designating the use or uses to be made of the water and by setting criteria necessary to protect the uses." 40 C.F.R. § 131.2. WQS also contain anti-degradation protections. 40 C.F.R. § 131.12. States identify impaired waters that do not meet WQS and "establish a priority ranking for such waters, taking into account the severity of the pollution and the uses to be made of such waters" on the 303(d)-list. 33 U.S.C. § 1313(d)(1)(A). Section 313 of the Act requires that Federal agencies with jurisdiction over or engaged in an activity "resulting, or which may result, in the discharge of runoff of pollutants" must comply with all water pollution control and abatement laws "in the same manner, and to the same extent as any nongovernmental entity." *Id.* § 1323(a).

The Forest Service violated the CWA and NEPA because it failed to demonstrate that the designation of a 385-mile motorized route network system (in addition to a 2,083-mile road system) adheres to water quality protections.  Conservation organizations commented that the DEIS failed to adequately assess potential impacts to water quality in individual stream segments, effects on 303(d)-listed streams, the effectiveness of BMPs employed, and the ability of the Forest Service generally to comply with § 313 of the Clean Water Act.  The overarching concern was that the DEIS failed to include any site-specific analysis, relying instead on suggestions that water quality would be dramatically improved simply through the end of cross-country travel. (Response 3-02-9: All action alternatives would result in fewer stream crossings compared to the existing condition (Alternative 1).  In making this conclusion, the Forest Service ignored the effects of the designated system itself and the use of that system on water quality. Instead of addressing these concerns in the FEIS, the agency simply referred commenter's back to the analysis they questioned in the first place. (FEIS Response to Comments 3.02-7). A new WQMP does not guarantee that existing legacy problems will be addressed in a timely manner, if at all. This is a classic example of failing to take a hard look at the impacts of a proposed action, in violation of NEPA, while also violating a substantive legal mandate.

The FEIS lists streams that are on the 303(d) list, but it does not describe how the project will or will not comply with the CWA.  The FEIS admits that "Stream flow diversions at road and motorized trail-stream crossings can result in significant erosion of road surfaces and hillslopes. Currently there are 2,408 native surface roads and motorized trail stream crossings by major river basin." SDEIS page 128.  Despite the fact that the decision will designate and display on the MVUM 41.7 miles of new routes with documented erosional features,, 1,676 stream crossings on perennial   and intermittent streams, 769 miles of native surface roads and motorized trails in RCAs (FEIS at page 147), the FEIS does not explain the site-specific effects on water quality of these routes and stream crossings or the use of them by OHV riders even though the Forest Service admits that the roads and trails generally have significant effects on water quality.

It is stated that: "for changes of Vehicle Classes through Maintenance Levels, these are pre-existing routes so the loss of productivity has already occurred, and there would be minimal effects on hydrology resources". This assumes the new uses will not impact the resources without a site-specific analysis.

The inadequacy of the analysis and the inability of the public to fully assess whether the Forest Service will comply with its obligations under the Clean Water Act stems from the agency's overreliance on generalities, averages, and uninformative listing of numbers, like total number of stream crossings, in its assessment.  This discussion does not satisfy the disclosure or analysis requirements of NEPA.  Discussing impacts to watersheds and water quality in such terms only serves to bury significant impacts particular sections of the transportation system are having on particular stream segments.  For instance, it is insufficient merely to list the 303(d)-listed stream segments somewhere in the FEIS, but then use road density calculations or total number of stream crossings as a proxy for real analysis of effects on water quality.  Water-quality impaired streams are listed by stream segment due to violations of certain water quality standards, and use of generalities and averages can never explain how the Forest Service will bring these individual stream segments into compliance with the Clean Water Act.  The same is true regarding

explanations of whether the proposed transportation system will ensure the various tiers of waters will be protected in accordance with the anti-degradation policy of the Clean Water Act and a newly adopted WQMP.

Even assuming, for the sake of argument, that impacts to water quality across the TNF river basins may improve overall by eliminating cross-country travel, this does not mean that California's WQSs and associated CWA protections are satisfied for specific waters.  Instead, the FEIS must assess whether those system routes (and unauthorized routes that will remain on the ground even after this process) affect water quality along specific stream segments, and if it determines that individual routes will contribute to water quality standard violations in individual stream segments, it must not designate the route and must take measures to stabilize the route.  In particular, the Forest Service must explain, with specificity, how the project will ensure that 303(d)-listed streams like the water quality-limited segments of Humbug Creek, Kanaka Creek, Donner Lake, Stampede Reservoir, Squaw Creek and the Truckee River will come into compliance with water quality standards for pathogens, sediment, and water temperature. The Forest Service has thus failed to satisfy NEPA's procedural duties and CWA's substantive duties.

Furthermore, the Forest Service is required to meet its own water quality management plan for non-point source pollution.  Among other things, the plan requires that:

> Each Forest's OHV plan will:
>
> 1)   Identify areas, or routes, where OHV use could cause degradation of water quality.
> 2)   Establish baseline water quality data for normal conditions as a basis from which to measure change.
> 3)   Identify water quality standards and the amount of change acceptable.
> 4)   Establish monitoring methods and frequency.
> 5)   Identify controls and mitigation appropriate in management of OHVs.
> 6)   Restrict OHV use to designated routes."

*Water Quality Management For Forest System Lands in California Best Management Practices*, USDA Forest Service Pacific Southwest Region, September 2000, section 12.42.7.b., at p. 73. Baseline water quality data is not provided or established, and areas and routes where OHV use could cause degradation of water quality are not specifically identified.  The FEIS fails to identify water quality standards and the amount of change acceptable, nor does it establish monitoring methods and frequency or identify controls and appropriate mitigation.  Accordingly, the Forest Service violates provisions under the CWA for control of nonpoint source pollution.

In a DEIS comment letter dated December 24, 2008, The Environmental Protection Agency (EPA) also questioned whether the Forest Service's actions were consistent with the CWA.
> **Water Quality** *Demonstrate that the Preferred Alternative will help meet TMDL requirements.* Squaw Creek and the Truckee River between Lake Tahoe and the California/Nevada Stateline are subject to Total Maximum Daily Loads (TMDL) for sediment. Both of these TMDLs require specific, quantified sediment load reductions over

30

the next 20 years: 25% for Squaw Creek and 20% for the Middle Truckee River. Both contain load allocations that require approximately 55% sediment load reductions from dirt roads from existing conditions. The Middle Truckee River Sediment TMDL specifically states that the Tahoe National Forest Motorized Travel Management Plan will be a key component to meeting the load reductions required from dirt roads.

> ***Recommendation:***
> The FEIS should include data that demonstrate that Alternative 6 - Preferred Alternative (Preferred Alternative) will help meet the required sediment load reductions from dirt roads from existing conditions. If such load reductions will not be achieved, than additional Best Management Practices (BMPs) and mitigation measures should be adopted and incorporated into the Preferred Alternative to meet TMDL requirements.

To this, the Forest Service replied in FEIS response 3.02-14 that:

> The following actions would meet TNF obligations under the Truckee River TMDL, conform to the Truckee River Basin Plan Prohibitions, and maintain or improve water quality in the Truckee River:
> • Prohibiting cross country travel
> • Reducing the use of unauthorized roads and trails by motor vehicles
> • Reducing the season of use on motorized native surface roads and trails
> • Reducing the amount of "Open Areas" and limiting their season of use
> • Reducing stream crossings
> • Reducing native surface roads and motorized trails within close proximity to streams (RCA's)
> • Accounting for land ownership patterns.
>
> It is not possible to quantify the load reduction expected from the proposed action. This document does not propose to change the hydrologic footprint on the TNF; it only defines where motorized use is acceptable. Passive recovery would occur on the majority of the routes not designated for motorized use over the next 10 to 20 years. Some routes may warrant active restoration.

Again, this response suggests that because there will be less miles of open system routes that water quality across the district will necessarily conform with the requirements of the CWA. Despite the expert agency's concerns expressed about water quality, the Forest Service plowed forward with its plan, failing to heed EPA's comments by altering its action alternatives or otherwise modifying the route designation proposals.

The Forest Service also ignored requests of the Lahontan Regional Water Quality Control Board (LRWQCB) in a letter dated May 15, 2007 that the agency take specific actions in order to protect water quality. Specifically, the RWQCB noted that "[e]ssential routes authorized under the NFTS should be reconstructed and/or retrofitted when needed with appropriate BMPs to control nonpoint source pollution." In FEIS response 3.02-7 it is stated: "The primary method for assuring compliance with the Clean Water Act is through implementation of Best Management Practices (BMPs). BMPs are implemented as mitigation measures specified in FEIS Appendix A (Site Specific Road, Trail and Open Area Information) for any motorized trail to be added to the

National Forest Transportation System or any lands to be established as "Open Areas." The Forest Service did not explain when or how the agency would assess the need for these measures.

The RWQCB also recommended that the TNF consider conversion of all existing wet crossings on the associated project roads and trails to 100-year flood plain-spanning bridges in order to protect the environment and avoid potential project delays associated with obtaining Basin Plan prohibition exemptions *Id*. This obviously would also apply to newly designated roads and trails. The only response relating to 100-year flood plains was in FEIS 3-02-22 that said "Basin plan prohibitions also address discharge of waste or other deleterious material to surface waters or the 100-year floodplain of the Little Truckee River, the Truckee River, or any tributaries. All action alternatives would reduce the miles of routes within Riparian Conservation Areas and the number of stream crossings." This did not address the RWQCB's comments. The agency fails to recognize that in designating the 2,395-mile system and displaying it on the map, the agency is making a decision that must comply with the CWA at present for all routes and not at some unspecified time in the future and has failed to comply with NEPA requirements for full disclosure of environmental impacts.

### C.  THE ROD AND THE FEIS VIOLATE THE TRAVEL MANAGEMENT RULE

#### 1.  *"PURPOSE AND NEED" STATEMENT IS IN VIOLATION OF THE TRAVEL MANAGEMENT RULE*

The Purpose and Need statement as implemented in the FEIS is insufficient to comply with the requirements of the TMR. The purpose of proposed travel management actions under 36 C.F.R. 212 Subpart B is clearly established:  to designate (including class of vehicle and time of year) roads, trails, and areas for motor vehicle use and prohibit motor vehicle use off those designated routes and areas (i.e., ending widespread cross-country travel).[27]  The Travel Management Rule also states that "in designating National Forest System roads, National forest System trails, and areas on national Forest System lands for motor vehicle use, the responsible official **shall** consider effects on" a suite of items.[28]  The Forest crafted and interpreted the purpose and need for this project in such a way that this criteria was only analyzed for those routes that were seen as **additions** to the system, and not those routes that were already in existence as part of the NFTS.  While previous NEPA decisions could be incorporated into this process to satisfy the required analysis, the Forest failed to provide information about these past NEPA decisions, leaving the public and the decisionmaker with no way to determine if the appropriate criteria had been analyzed for each route designated by this process.

All current directions and authority that allow, restrict, and prohibit vehicle use off road vehicles on National Forest lands are tiered from Executive Order 11644, signed by President Nixon in 1972, and modified by President Carter's E.O. 11989 in 1977.[29]  These executive orders should

---

[27] 36 C.F.R. 212.50 (a) "Purpose"
[28] 36 C.F.R. 212.55(a) (emphasis added).
[29] Route Designation Guidebook: National Forests in California, USDA Forest Service, June 2004 (revised September 2006).

be the guiding principles for establishing the purpose and needs related to OHVs and route designation projects. The Orders state that the route designation procedures "will ensure that the use of off-road vehicles on public lands will be controlled and directed so as to protect the resources of those lands, to promote the safety of all users of those lands, and to minimize conflicts among the various uses of those lands."[30]  In accomplishing this broad goal, the executive orders specifically require that the designation of motorized areas and trails shall be in accordance with the following:

1) Areas and trails shall be located to minimize damage to soil, watershed, vegetation, or other resources of the public lands.
2) Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats.

3) Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.

4) Areas and trails shall not be located in officially designated Wilderness Areas.[31]

The Travel Management Rule (TMR) came into being because management of OHV use in the national forests was not meeting the environmental objectives of the executive orders.[32] The TMR, therefore, carries forward relevant language from the Executive Orders to trails and areas, which requires minimization of damage to soil, watershed, vegetation, and other forest resources; minimization of harassment of wildlife and significant disruption of wildlife habitat; and minimization of conflicts between motor vehicle use and existing or proposed recreational uses of National Forest System lands or neighboring Federal lands, and conflicts among different classes of motor vehicle uses of National Forest system lands or neighboring Federal lands.[33]

Instead of incorporating the clear general criteria and minimization criteria of the Executive Orders and TMR into the statement of purpose and need, the Forest Service chose to emphasize providing new, additional motorized recreational opportunities and elevated this goal to the same level of importance as protecting the resource. Nowhere does the Travel Management regulation state that providing *motorized* recreational opportunities is a primary need.  In fact, the term "motorized recreation" is never used.  The term "motor vehicle use" is used in the context of the objective to minimize damage to natural resources, harassment of wildlife, and conflict among users, as required by the executive orders. Where the TMR does require that the responsible official consider provision of *recreational opportunities*, the rule makes no distinction between

---

[30] Executive Order 11644 § 1 (1972) as amended by Exec. Order 11989 (1977) – Use of Off-Road Vehicles on Public Lands.
[31] Id.
[32] [T]he magnitude and intensity of motor vehicle use have increased to the point that the intent of E.O. 11644 and E.O. 11989 cannot be met while still allowing unrestricted cross-country travel. Soil erosion, water quality, and wildlife habitat are affected. Some National Forest visitors report that their ability to enjoy quiet recreational experiences is affected by visitors using motor vehicles. A designated and managed system of roads, trails, and areas for motor vehicle use is needed. (70 Fed. Reg. 68265).
[33] 36 C.F.R. § 212.55 (b)(1)-(4)

non-motorized and motorized uses.  Therefore, it is unclear why motorized recreation opportunities have been elevated to a level of importance above both non-motorized recreation opportunities and the primary goal of implementation of the TMR, which is to limit the environmental impacts of OHV use in national forests.

In the Appellant's DEIS comments, we recommended strongly that the Forest adjust the Purpose and Need statement to reflect more accurately the intent of the Executive Orders, Subparts A and B of the Travel Management regulations, and to meet the purpose of travel planning. "The purpose and need statement is insufficient to set up a proper and complete analysis. In our view, travel planning must evaluate and address the environmental, social, and cultural impacts associated with unauthorized routes *and* currently designated roads, trails, and areas, as identified through a landscape-scale, science-based Travel Analysis." Comments submitted December 26, 2008 TWS et al. Specifically, we asked that the purpose and need be changed to reflect the following:

- The need to eliminate cross-country motorized travel and move to a system of designated roads, trails, and areas consistent with the Travel Management Rule and the Executive Orders on use of off-road vehicles on public lands;
- The need to address degradation of environmental, social, and cultural resources associated both with user-created routes and currently designated roads, trails, and areas, as identified through Travel Analysis;
- The need to—by way of a science-based analysis—"identify the minimum road system needed for safe and efficient travel and for administration, utilization, and protection of National Forest System lands" and identify roads that are "no longer needed to meet forest resource management objectives and that, therefore, should be decommissioned or considered for other uses, such as for trails"
- The need to provide opportunities for motorized and non-motorized recreation within the carrying capacity of the land (minimizing damage to soil, watershed, vegetation, cultural sites, and other resources of the public lands; and minimizing harassment of wildlife or significant disruption of wildlife habitats);
- The need to adjust both the core transportation system and recreation travel network in light of funding limitations for maintenance, monitoring, and enforcement; and The need to address public safety concerns, user conflicts, private property rights, lost non-motorized recreational opportunities, and impact to natural soundscapes and air quality that have arisen or might be expected to arise given recent trends in motorized use.

The Tahoe National Forest failed to adjust the Purpose and Need statement to correct the identified deficiency. In its response to comments (page 23 Appendix N), the Forest does not address how it arrived at the need "for limited changes to the NFTS to provide a diversity of motorized recreation opportunities."[34]

---

[34] FEIS page 7

**Forest Service Response**: It is fully within the Forest Supervisor's legal authority to determine the scope of this analysis. 36 CFR 212.50(b) states:

> The responsible official may incorporate previous administrative decisions regarding travel management made under other authorities, including designations and prohibitions of motor vehicle use, in designating National Forest System roads, National Forest System trails, and areas on National Forest System lands for motor vehicle use under this subpart.

This response really doesn't address our concerns that the agency failed to look at the currently designated roads, trails, and areas.  Because of this flawed Purpose and Need statement, the Tahoe NF does not meet the minimization criteria listed in the Travel management regulations and is in violation of the mandates of NEPA not to have an overly narrow purpose and need.

> ### 2.   *THE TRAVEL MANAGEMENT PLAN FAILS TO MINIMIZE THE EFFECTS OF OFF-HIGHWAY VEHICLES TO NATIONAL FOREST SYSTEM LANDS AS REQUIRED BY 36 C.F.R. § 212.55 AND EXECUTIVE ORDER 11644, AS AMENDED BY EXECUTIVE ORDER 11989.*

The Forest has designated NFTS roads and trails for continued motor vehicle use without applying the appropriate criteria as required by the Travel Management regulation. Former Chief of the Forest Service, Dale Bosworth described "unmanaged recreation" including the use of off-road vehicles as one of the top four threats to America's forests, deserts and grasslands.[35] Accordingly, the Forest Service promulgated the 2005 Travel Management Rule because "[t]he growing popularity and capabilities of [off-highway vehicles (OHVs)] demand new regulations, so that the Forest Service can continue to provide these opportunities while sustaining the health of [National Forest System] lands and resources."[36] The new regulations were not intended to be a continuance of the *status quo*.

Instead, the TMR requires the responsible official to designate a system of roads, trails and areas "by vehicle class and, if appropriate, by time of year."[37] In designating roads, trails and areas (or closing them), the responsible official is required to consider generally the:

> …effects on National Forest System **natural and cultural resources**, public safety, provision of recreational opportunities, access needs, **conflicts among uses of National Forest System lands**, the need for maintenance and administration of roads, trails, and areas that would arise if the uses under consideration are designated; and the **availability of resources for that maintenance and administration**.

(emphasis added).[38] In addition to the general criteria described above, the responsible official *shall* minimize:

---

[35] http://www.fs.fed.us/projects/four-threats/
[36] 70 Fed. Reg. 68264-68265
[37] 36 C.F.R. § 212.51(a)
[38] 36 C.F.R. § 212.55(a); Executive Order 11644, as amended by Executive Order 11989.

1. Damage to soil, watershed, vegetation, and other forest resources;
2. Harassment of wildlife and significant disruption of wildlife habitats; and
3. Conflicts between motor vehicle use and existing or proposed recreational uses of National Forest System lands or neighboring Federal lands. [39]

The Forest Service erred in designating particular roads and trails for motor vehicle use by not following the criteria found in the 2005 TMR and E.O. 11644, as amended by E.O. 11989 (hereafter referred to as the "Executive Orders").

This duty was recently re-affirmed and elaborated upon by a U.S. District Court in the Northern District of California, when evaluating Bureau of Land Management (BLM) resource management plans for the California Desert Conservation Area.[40]  In that case, the court addressed the requirements for the BLM to implement its own regulations pertaining to the management of off-highway vehicles, which mirror the Executive Orders exactly. While the language of these regulations differs slightly from those promulgated by the Forest Service to implement the Executive Orders, the intent of the regulations is identical – to control the impacts caused by off-road vehicles and to locate roads, trails and areas in such a manner as to minimize the impacts to natural resources and user conflicts. Moreover, they implement the same executive orders, which are unequivocal in their mandate to minimize effects of ORV route designations.

Consequently, the recent decision on how the BLM should implement its regulations managing off-road vehicles applies directly to the case at hand – how the Forest Service should implement its own off-highway vehicle regulations and how it should implement the Executive Orders. The court found that the BLM had failed to properly apply its regulations when it failed to demonstrate how the "minimization criteria were in fact applied when OHV routes were designated."[41] The court went on to explain that "minimize" refers to the *effects* of route designations, i.e. the BLM is required to place routes specifically to minimize "damage" to public resources, "harassment" and "disruption" of wildlife and its habitat, and minimize "conflicts" of uses."[42] This same interpretation of "minimize," and the requirement that the agency demonstrate on the record how that criteria have been implemented, including through individualized determinations for specific routes and trails where vehicle use will be allowed, applies to the Forest Service.

Although the Forest Service has a mandatory duty to minimize the adverse impacts of off-road vehicle use to the natural resources of the Tahoe National Forest and to minimize conflicts between recreationists, the Tahoe Travel Plan fails to demonstrate that the agency has carried out its duty to make route designation decisions that actually will minimize damage to soil, watershed, vegetation, or other resources, which is a violation of the executive orders and TMR. Further, it is a violation of NEPA to fail to take a hard look at whether the agency's actions will

---

[39] *See* Executive Order 11644 and 36 C.F.R. § 212.55(b) (the responsible official "shall consider effects on the following, with the objective of minimizing . . .")
[40] *Ctr. for Biological Diversity v. BLM*, 2009 U.S. Dist. LEXIS 90016 (N.D. Cal. 2009)
[41] *Id.* at *28.
[42] *Id.* at *30.

comply with applicable legal authority and the site-specific effects of individual route designations.  The Forest Service is incorrect to assert that it need only consider the effects of route designations with the objective of minimizing them and not select the most protective alternative, though we note that we and others have indicated in comments that we see little analysis or consideration of whether individual routes minimize impacts.  In its response to public comments that the Forest Service needed to minimize damage to soil, watersheds, vegetation and other resources, as required by the executive orders, the agency responds (Appendix N 2.00-35):

> "The direction in the Executive Orders and Travel Management Regulations to consider minimizing impacts to various resources does not require the Forest Supervisor to select the most restrictive alternative. As described in the Preamble to the national Travel Management regulations, —[i]t is the intent of E.O. 11644 that motor vehicle use of trails and areas on Federal lands be managed to address environmental and other impacts, but that motor vehicle use on Federal lands continue in appropriate locations. An extreme interpretation of "minimize" would preclude any use at all, since impacts always can be reduced further by preventing them altogether. Such an interpretation would not reflect the full context of E.O. 11644 or other laws and policies related to multiple use of NFS lands" (Fed Reg V.70, No. 216, p 68281).

While an extreme interpretation of the executive orders might preclude any use at all, we have never asked for such an interpretation of the executive orders.  Instead we have asked for the Forest Service to apply the minimization criteria of the executive orders and TMR to individual route designations, including both the additions the agency considered in this process and the existing system routes the agency arbitrarily excluded from its analysis in this planning process.

Below, we point out several route-specific examples of how the responsible official failed to minimize—or at least demonstrate on the record that he had minimized—the effects of off-highway vehicles to natural resources and between recreationists as required by the Executive Orders and 36 C.F.R. § 212.55(b)(1) and (2).  In no way should this be viewed as an exhaustive list of the routes for which the Forest Service did not demonstrate compliance with the minimization criteria—in fact, it is merely a handful.  After all, it is fundamentally the *agency's* duty to "show its work" on the record, not the public's.  That said, throughout commenting we pointed out natural resource and user conflicts caused by these and many other routes, which the Forest Service should have taken into consideration in its analysis.

### *Example Route Designations in which the Forest Service did not Minimize Effects*

- **Western States Trail – Duncan Canyon Roadless Area:** The Western States Trail through Duncan Canyon in a roadless area was designed and built for horses and runners/hikers. It crosses a year-round stream. The Forest Service should not legitimize OHV use on it and deter those who prefer quieter and less polluting activities.
  **Forest Service Response:** The Western States Trail through the Duncan Canyon Inventoried Roadless Area is an existing NFTS motorized trail. Closure of existing NFTS trails is outside of the scope of this decision. Although the trail may have been originally

37

designed for equestrians and hikers it is currently being managed and maintained for motorized use.

*Appellant's Response:* Motorcycle riders ride through Duncan Creek leaving oil pools.

- **Burlington Motorcycle Trail Area (Page 178 Appendix N):** The Preferred Alternative includes an additional 8 trails in the Burlington area totaling 12.1 miles. These trails include YRS-SF4, YRS-SF5, YRS-SF6, YRS-B12, YRS-066W, YRS-B5 AND YRS-B7. These trails were included since they were site specifically recommended by the public and do not have any significant resource concerns which could not be mitigated. These additional trails bring the total riding opportunities to 44 miles of motorized single-track trails in the Burlington network.

  *Appellant's Response:* In "Burlington" changes are made (routes added) through the ROD that override the changes recently made through prior NEPA review. The **Forest Service** Washington Office FS-643 (August, 1999 page 6) states: "Roads analysis will not duplicate work already completed through other assessments or analyses."

  The FEIS should explain how these changes are a justified escalation of a previously NEPA-reviewed project limiting motorized mileage at Burlington.

- **Castle Peak Inventoried Roadless Area (Appendix N page 217):** Respondents commented that they do not want new OHV routes added in the Castle Peak Inventoried Roadless Area due to the engine noise, impacts to wildlife, and impacts to water quality. **Forest Service Response:** The Preferred Alternative adds 5 motorized trails (D_14E08, D_TKN-004, TKN-J4, TKN-J5 and TKN-J6) totaling 1.02 miles to the NFTS in the Castle Peak Inventoried Roadless Area. These trails were included in the Preferred Alternative since they were site specifically recommended by the public and did not have any significant resource concerns which could not be mitigated (see Appendix A, Site Specific Road, Trail and Open Area Information). These trail additions do not have any significant impact to the roadless area characteristics (see Chapter 3.09, Inventoried Roadless Areas & Special Areas).

### TKN-J4

**Forest Service Response:** (Appendix N page 217): TKN-J4 is located west of Andesite Peak with approximately 0.6 miles located in the IRA. This route accesses existing dispersed recreation sites. The route enters the edges of Castle Peak IRA, and is close enough to Interstate 80 that traffic noise from the freeway is still noticeable. This route would have a minor impact on solitude because the noise of motor vehicles would not be louder than the background noise from the freeway in the immediate vicinity.

*Appellant's Response:* Though the route itself may have noise from the freeway, it would increase the noise within the IRA and extend the noise from this route another 1/2 mile into the IRA. Many of these responses were also included as comments in the DEIS and SDEIS that were unanswered by the Forest Service.

1. This unauthorized route has a high erosion risk and moderately high water quality risk in the EMDS model, a segment with 15-20% slope with rill erosion and sediment deposits, and another 2 segments with 30% slope that is experiencing sheet erosion.

2. This route passes through an agency-inventoried roadless area (Castle Peak).
3. This route is in late seral open CWHR MIS habitat (blue grouse), is in Tahoe National Forest Carnivore Network, intersects early and mid seral coniferous CWHR MIS habitat (mountain quail), and intersects late seral closed canopy coniferous CWHR MIS habitat (American marten, spotted owl, northern flying squirrel).
4. This route has the potential to increase fugitive dust.
5. The TES Plant Survey Field Form states that this route "crosses numerous ephemeral drainages that have steep slopes leading to the drainages that do not have water bars. The soils along this route are highly erosive and show natural erosion and erosion from historic timber harvest activities. The route itself is a channel in some areas due to the amount of erosion on the route." The route passes through potential habitat for *Lewisia kelloggii* but surveys were never done. Lacking a survey, the TNF must assume occupancy. The plant occurrence potential is not listed, however, in the road cards in the DEIS.
6. The trail crosses Castle Creek, a perennial stream, where the crossing interrupts the hydrology of the meadow. *Bruchia bolanderi* was found within 30 feet of TKN-J4. [43]  *Bruchia bolanderi* in Castle Valley meadow is directly impacted by erosional factors due to sediments deposited by unrestrained use of the trail.
7. This route is shown on the preferred alternative as a single route. It is not. Within 1 mile of the start of the route there are three forks in the road.  Multiple 'unauthorized routes' tear through alpine meadows and across areas of fragile soil.  The end of this route points to Round Valley, Peter Grubb Hut and the Pacific Crest Trail.

### TKN-J5

**Forest Service Response** (Appendix N page 218): TKN-J5 (0.3 mi.) is a route located in Castle Valley that terminates at "Slab Rock". This route accesses an existing dispersed recreation site. The route enters the edges of Castle Peak IRA, and is close enough to Interstate 80 that traffic noise from the freeway is still noticeable. This route will have a minor impact on solitude because the noise of motor vehicles would not be louder than the background noise from the freeway in the immediate vicinity.

By adding this preexisting trail to the NFTS, there would continue to be minor effects to the high scenic quality landscape of the IRA due to vegetative disturbance and compaction at the turnaround point. The majority of the Castle Peak IRA will remain a good candidate as a reference landscape because proposed changes to the NFTS are on the periphery of the IRA. In the Preferred Alternative of the FEIS, TKN-J5 ends in a flat area adjacent to the trees and before the granite outcrop. The terminus of the trail is 300 feet distance from the *Erigeron miser* occurrence located on Slab Rock to minimize the risk of impact to this sensitive plant from motor vehicles.

***Appellant's Response:***

1. The route passes through Castle Valley meadow and interrupts the hydrology. A portion of the route has overland flow which channels water to Castle Creek. There is a known occurrence of the rare moss *Bruchia bolanderi* in Castle Creek

---

[43] Ibid.  (p. 495)

located 30 ft. upstream and 50 ft. downstream from the route crossing. There is a known occurrence of the sensitive plant *Erigeron miser* located at the end of the route that is being impacted by motorized use. Water is flowing from the adjacent wetland down route adding to the cumulative impacts to Castle Valley.

2. This unauthorized route has a seep near the beginning point which is impacted by motorized use, has steep slopes and gullies, and has rill erosion and some sediment deposit. The parking near the stream and meadow could cause problems. Two stream crossings – one perennial and one intermittent – leads to a moderately high erosion risk and a high water quality risk

3. The route intersects early and mid seral coniferous CWHR MIS habitat (mountain quail), and intersects late seral closed canopy coniferous CWHR MIS habitat (American marten, spotted owl, northern flying squirrel).

4. This route passes through an agency-inventoried roadless area (Castle Peak), crosses the Pacific Crest Trail, passes through a meadow management zone, passes within 0.25 miles of a northern goshawk nest tree (PAC#R05F17D57T15), is in the Tahoe National Forest Carnivore Network, and passes through willow flycatcher and great gray owl habitat.

5. This route has the potential to increase fugitive dust.

6. The surveyor for the TES Plant Survey Field Form "recommend(s) closing this route until extensive mitigations are implemented." It is reported that the sensitive moss species *Bruchia bolanderi* is directly impacted by motorized use of this route.

7. This route crosses Castle Creek and wanders through mule ear meadows and red fir forests up to granite spur at the base of the volcanic rock that forms Castle Peak.  At a point two-thirds of the way up, this route hits a very steep section composed of very soft soils and interspersed boulders. The route is perpendicular to the contour and is very susceptible to erosion. The track is already littered with boulders ripped out of the soil and has become deeply pitted by troughs that will become gullies unless this section is rerouted.  Above the erosion-prone section is a relatively flat segment that goes through an established red fir forest.  There are multiple routes in this area.  If the 'pioneering' tendencies of the OHV users are not curbed here, the forest floor will become compacted with many intersecting roads spread out over a large area instead of being limited to a specific defined-width route.

8. The lower segment of the route is susceptible to the impacts of 'dispersed camping.'  The meadow grasses have been crushed and the soils compacted in several areas. Given the sensitive nature of the soils and meadows in this area, it would be unnecessarily detrimental to add the impacts of further OHV use to this route.

### *TKN-J6*

This unauthorized route passes through an agency-inventoried roadless area (Castle Peak). There is one APE heritage site (05175700374).

### *TKN-2*

**Forest Service Response** (Appendix N page 171):

40

This route is included in the Preferred Alternative since it was site specifically recommended by the public during collaboration meetings prior to the NOI and has no significant resource concerns which could not be mitigated (see Appendix A, Site Specific Road, Trail and Open Area Information).

**Appellant's Response:**
1. This unauthorized route passes through a spotted owl PAC (S1060.1), is in west slope chaparral CWHR MIS habitat (fox sparrow), is in open seral CWHRMIS habitat (blue grouse), in Tahoe National Forest Carnivore Network, intersects early and mid seral coniferous CWHR MIS habitat (mountain quail), and intersects late seral closed canopy coniferous CWHR MIS habitat (American marten, spotted owl, northern flying squirrel). As is true of all FEIS added routes, no mitigation is suggested for wildlife impacts.
2. The SDEIS road card found *Lewisia kelloggii* in 2008 being impacted by motorized vehicle use. Mitigation is to place barriers at end of route. There is no guarantee that this will protect the resource.
3. There are 3 APE heritage sites (05175300499, 05175300545, 05175300546). No response.
4. The route has the potential to increase fugitive dust.

### YRN-4

**Forest Service Response** (Appendix N page 171):
This route has no significant impact on the Inventoried Roadless Area characteristics. Designating this route would have a slight effect on the roadless character because it is a short segment that stays relatively close to an existing NFTS route.

**Appellant's Response:**
1. This unauthorized route has a high erosion risk in the EMDS model.
2. The route passes through an agency-inventoried roadless area (East Yuba).
3. The route is potential habitat for *Lewisia kelloggii*, yet has not been surveyed.
4. The route intersects early and mid seral coniferous CWHR MIS habitat (mountain quail), intersects late seral closed canopy coniferous CWHR MIS habitat (American marten, spotted owl, northern flying squirrel).
5. There is one APE heritage site (05175300386).
6. The route has the potential to increase fugitive dust.

The following routes all have responses that do not deal with the issues that are raised, but only say that they are included in the Preferred Alternative since they were site specifically recommended by the public during the collaboration process prior to the NOI and there are no significant resource concerns which could not be mitigated. However, barriers at the end of each route are only mitigations are suggested.

### YRN-5a

**Appellant's Response:**
1. This unauthorized route passes through an agency-inventoried roadless area (East Yuba).
2. The route is in Tahoe National Forest Carnivore Network, is in late seral open CWHR MIS habitat (blue grouse).

3. The route has the potential to increase fugitive dust.
4. The TES Plant Survey Field Form states that this route "is a spur within the RCA for the creek/stream." It is recommended that it be moved into the trees and out of the riparian vegetation."

### YRN-5c

*Appellant's Response:*
1. This unauthorized route is rated a moderately high erosion risk and high water quality risk in the EMDS model. The route passes through a wet meadow which is being impacted by motor vehicle use.
2. The route passes through an agency-inventoried roadless area (East Yuba).
3. The route is in the Tahoe National Forest Carnivore Network, is in west slope chaparral CWHR MIS habitat (fox sparrow), and is in late seral open CWHR MIS habitat (blue grouse).
4. The route has the potential to increase fugitive dust.

### YRN-11

*Appellant's Response:*
1. This unauthorized route has a high erosion risk and high water quality risk in the EMDS model.
2. The route contains the sensitive plant *Lewisia kelloggii* which is being impacted by motor vehicle use.
3. The route passes through an agency-inventoried roadless area (East Yuba).
4. The route is in late seral open CWHR MIS habitat (blue grouse), and in the Tahoe National Forest Carnivore Network.
5. The route has the potential to increase fugitive dust.
6. In the TES Plant Survey Field Form it is noted that this route ends at a meadow which has been driven through causing evident wheel tracks.

### YRS-G3

*Appellant's Response:*
1. This unauthorized route has a high erosion risk in the EMDS model. It crosses 1 stream and has ineffective waterbreaks leading to rill erosion.
2. The route passes through an agency-inventoried roadless area (Grouse Lakes). The route is within Nevada City critical summer range and intersects late seral closed canopy coniferous CWHR MIS habitat (American marten, spotted owl, northern flying squirrel).
3. The route has the potential to increase fugitive dust.

- **Trail 12E45:** Example of continuing damage due to failure to examine existing routes. **Forest Service Response** (Page 232 Appendix N page 232): The TNF will continue efforts to address the impacts associated with this trail. Closure of existing NFTS trails is outside of the scope of this project. Cumulative impacts from the existing NFTS motorized roads/trails and the proposed additions were considered in the analysis.

42

*Appellant's Comments in DEIS/SDEIS:*

Problem: The S. Fork of the Yuba River should be protected from erosion and water pollution resulting from the interface of OHV routes and the River.

1. Use of Riverbed of South Yuba River as OHV areas

    a. Upper Ford - 1300' of riverfront between 20' and 500' at widest point has been reduced to a barren gravel bar by OHV use over the years. Willows are being trampled. River banks are being eroded away on both sides of the river by multiple entry points to the river and by indiscriminate OHV 'play'. Trees are being toppled every year because the riverbank is weakened by OHV 'play'. Willows planted during a USFS restoration project on river right above ford have been cut down.

    b. Lower Ford – impacted area extends for over 430' of river front (100' to 170' wide). Multiple cutbanks on either side of river. USFS tried to close all but one on each side in 2005. Defeated by flood and overtopped by OHV users. Watch for attempt to 'create' another cutbank thru willows on south side. Watch forested island in SE quadrant disappear under OHV impact.

    c. Below Lower Ford, river right – OHV users have driven around and over USFS barriers to access river bottom and beach. 450' by 20' to 60'. Watch for stream bank erosion and toppled trees. Roots are driven over, exposed and trees will topple. 3 parallel roads parallel the river. Campfire ring within river bed.

2. Human waste – Prevalent throughout the entire area, within 100'of river in many cases and at Upper Ford actually in the riverbed while FS toilet is only 200 yards away. No apparent attempt to bury human waste. Danger to water quality.

3. Off route use – There are multiple routes leading off into forest that are not authorized – USFS has created barriers and OHV users have overtopped them or gone around them. Most barriers have failed to contain the abuse for more than one year.

4. Oil spill – water pollution – water quality issue – South Fork of Yuba is a water supply and should be protected from direct assaults on its water quality.

Recommendation:  Close OHV routes that provide direct access to the riverbed and that created surveyed Resource Damage to the River and its water quality.

Each route designation requires a detailed analysis of the effect of that designation on the minimization criteria of the executive orders and TMR, as well as other issues raised by staff and the public during comment periods. If the location of the trail does not minimize damage to natural resources, the agency cannot designate it. The Forest Service's failure to minimize damage to natural resources and conflicts between forest users, as well as its failure to "show its work" with respect to its examination of these criteria constitutes a violation of Executive Order 11644, as amended by Executive Order 11989, the TMR, and NEPA's "hard look" requirements.

**3. THE FOREST SERVICE FAILED TO COMPLY WITH SUBPART A AND SUBPART B BECAUSE THE AGENCY'S TRAVEL PLAN SHOULD HAVE**

### BEEN INFORMED BY A MINIMUM ROAD SYSTEM ANALYSIS TO COMPLY WITH SUBPART A AND SUBPART B

The Tahoe National Forest has improperly proceeded to carry out route designations under Subpart B of the Travel Management regulations (36 C.F.R. § 212—Travel Management) without first following the requirements under Subpart A, which have been in place since January 2001.  The intent of Subpart A was outlined in the federal register promulgating the regulation as:

> to ensure that decisions to construct, reconstruct, or decommission roads will be better informed by using a science based roads analysis; that the availability of road maintenance funding will be considered when assessing the need for new road construction; and that, instead of focusing on constructing new roads, emphasis will be given to reconstructing and maintaining classified roads while decommissioning unnecessary classified and unclassified roads. 66 Fed. Reg. 3219 Jan. 12, 2001.

To fulfill these goals, Subpart A requires forests to: a) identify the minimum road system needed for safe and efficient travel and for administration, utilization, and protection of National Forest System lands; b) identify the roads under its jurisdiction that are no longer needed to meet Forest resource management objectives, and that, therefore, should be decommissioned or considered for other uses, such as trails; and c) complete a science-based roads analysis to inform these decisions.  36 C.F.R. § 212.5(b). The Forest has failed to meet any of these requirements. Our organizations are very concerned that no attempt has been made by the agency to identify the minimum road system or unneeded roads for decommissioning. This is troubling given the massive road maintenance backlog on the Tahoe National Forest and the extreme impact the road system is having on the hydrological, biological and botanical values of the Forest.

Analyzing impacts to ecological and cultural resources across the entire transportation system is a critical factor in determining the minimum road system as envisioned by 36 C.F.R. § 212.5(b)(1).[44] Travel Analysis[45] should be used to determine the minimum system and to identify unneeded roads that should be decommissioned or considered for other uses, such as trails. Analysis and planning to determine the minimum route system should inform, and thus precede, designation of the current transportation system and designation of new routes for motorized travel. Designation of new routes cannot comply with the applicable regulations without a determination of the minimum necessary system.  Forest Service Manual, FSM 7712, states that:

> Travel analysis assesses the current forest transportation system and identifies issues and assesses benefits, problems, and risks to inform decisions related to identification of the minimum road system per 36 C.F.R. Part 212.5(b)(1) and designation of roads, trails and areas for motor vehicle use per 36 C.F.R. Part 212.51. . . . [T]ravel analysis informs decisions relating to administration of the forest transportation system and helps to identify proposals for changes in travel management direction (ex. 01).

---

[45] The travel analysis process expanded upon the roads analysis process and is the current method to be used to determine a forest's minimum road system.

44

> 1.  Use travel analysis (FSH 7709.55, ch. 20) . . . to inform decisions related to the designation of roads, trails, and areas for motor vehicle use per 36 C.F.R. 212.51.

While the Forest Service proceeded to provide for an exemption to the requirement to complete travel analysis prior to designation of routes on an MVUM, this exemption is in itself arbitrary and capricious.  It is impossible to imagine how a forest would comply with the full requirements of the regulation without conducting travel analysis.  In addition, this direction did not provide an exemption from the regulatory requirements of 36 C.F.R. § 212.55.  Therefore, the identification of the minimum road system by each national forest, which has been a requirement since 2001, should have been completed prior to designating routes on the MVUM.  Without the information about what is the minimum road system and the results of travel analysis, the Forest has failed to comply with the requirements of 36 C.F.R. § 212.55 to:

> consider . . . conflicts among uses of National Forest System lands, the need for maintenance and administration of roads, trails, and areas that would arise if the uses under consideration are designated; and the availability of resources for that maintenance and administration.

This has produced an EIS that is lacking in the necessary information to support the ROD's compliance with the TMR.

The requests that the Forest Service complete travel analysis and a minimum road system identification were not adequately addressed in the ROD or the FEIS. The Tahoe National Forest, without responding to all of these points individually, simply replied in Appendix N (Response to Public Comments) that "The travel management regulations do not require completion of Subpart A prior to implementation of Subpart B's prohibition and designations, or as a precondition to any project level (site-specific) travel management decisions. Upon completion of this process, it will be determined how to best proceed in the future with the implementation of Subparts A and C. The Region is in the process of developing guidelines for addressing Subpart A."

Notwithstanding the assertion that the region is thinking about how to address Subpart A in the future, that does little to cure the inadequacies of the agency's process for *this* travel management process, *including that the Forest Service did not analyze the impacts of the current transportation system*.  Because the Forest is completing the travel management designation process, compliance with the federal regulation was not optional, and the Forest Service should have ensured that its decisions were in compliance with all of 36 C.F.R. Part 212. The Forest Service has had nearly ten years to comply with the requirements in 36 C.F.R. § 212.5(b), and it should have done so in order that that analysis could have informed the important decisions made in this travel planning process.

In the US EPA letter dated December 24, 2008, it was stated: "We acknowledge the constraints of funding and resources; nevertheless, we had hoped the Forest Service would take this opportunity to review and rationalize the NFTS, pursuant to Travel Management Rule direction to identify the minimum road system needed (36 CFT Part 212 Subpart A), and to address known road-related resource impairments and use conflicts of both the existing NFTS

and unauthorized user-created system, and align the transportation system with maintenance
and enforcement capabilities.

### 4.  MAINTENANCE AND ADMINISTRATION OF ROADS, MOTORIZED TRAILS, AND MOTOR VEHICLE AREAS WAS NOT PROPERLY CONSIDERED IN VIOLATION OF THE TRAVEL MANAGEMENT RULE.

Both Subparts A and B of the Travel Management Rule address the affordability of the Forest
transportation system. Subpart A requires the Forest to determine the minimum system needed to
"reflect long-term funding expectations."[46] Subpart B requires the Forest to "consider effects
on…the need for maintenance and administration of roads, trails, and areas that would arise if
the uses under consideration are designated and the availability of resources for that maintenance
and administration."[47] Direction in the Forest Service Manual provides that the forest must:

> *Consider maintenance and administrative obligations and capability in the context of
> future budgets and staffing. Administrative units and ranger districts **should avoid
> adding routes to the forest transportation system unless there is adequate provision for
> their maintenance**.*[48]

**Forest Issues Group submitted the following DEIS comments dated December 17, 2008**

1.  There is no current likelihood that the Forest Service can fund maintenance of its
    current road system, let alone add additional routes to the system. The only
    alternative is to reduce its base system and get massive input of additional funds
    from Congress.

    a.  The Forest Service has acknowledged a national shortfall of over $8
        billion dollars for road maintenance *(News Release USDA Forest Service
        Washington, D.C. FS-0116)*.
    b.  The Tahoe National Forest in its *Draft Roads Analysis (chapter 3.1.1)*
        stated: "Based on the summary of the 2002 Road Condition Surveys,
        Congressionally appropriated road maintenance funding is approximately
        20% of what is needed for the current system. 95% of the road
        maintenance funding the Tahoe received in 2002 went into the
        maintenance level 3, 4, and 5 roads. Decommissioning level 1 and 2 roads
        requires additional money and does not free up significant funding for the
        maintenance of the remaining road system, and much needed annual road
        maintenance and deferred maintenance is not done resulting in
        disinvestments in facilities and growing safety concerns." Annual
        maintenance costs (Table 2.7) exceed $13,000,000. Based on the FY 2002
        budget, the TNF had just over $600,000 in annual maintenance funding.
        Deferred maintenance needs are almost $170,000,000 (Table 2.7).

---

[46] 36 C.F.R. 212.5 (b)
[47] 36 C.F.R. 212.55 (a)
[48] FSM 7715.03(6) (emphasis added) [*see also* FSM 7715.6 (6)]

c. The current *DEIS (Volume 3 page 596)* states: "In recent years, annual road maintenance budgets have not been sufficient to maintain the entire road system to standard. This has led to an increase in deferred maintenance. In past decades, commercial users (typically timber purchasers) maintained a substantial portion of the national forest road system on the Tahoe National Forest during timber sale activities. With the decrease in timber sales, however, fewer roads are being fully maintained (meaning deferred maintenance needs did not increase). An estimated 28 percent of the Tahoe National Forest road system was fully maintained in 2007. Table 3.08-1 presents average maintenance costs for the Tahoe National Forest. While the federal budget currently exceeds revenues, it is not projected to do so after 2012. Revenues are expected to increase, but mandatory spending will increase at a faster rate. As a result, federal discretionary spending will decrease, likely leading the Forest Service to experience declining budgets through 2017."

d. *DEIS Volume 3 page 601* states: "36CFR212.55 requires consideration of the need for maintenance and administration of the designated National Forest Transportation System (NFTS). NFTS expenses include needed maintenance work that has not been completed (deferred maintenance) and costs of routine maintenance to maintain the facility at its current standard (annual maintenance). Proposed changes to the NFTS may have additional implementation costs such as sign installation and resource improvements. A current estimate of road deferred maintenance on the Tahoe National Forest is $115,000,000. Note this value is based on a random sample of deferred maintenance needs taken nationally in 2007; it is not statistically valid at the national forest level, however, it can be used as an indicator of maintenance needs for the existing road system."

e. *DEIS Volume 3 page 604* states: "All alternatives require over $20 million annually to fully maintain the NFTS. Alternatives 1, 3, 4, and 7 all cost the most at over $28 million because little or no roads will be downgraded from passenger car to high clearance. Continuing to maintain these roads for passenger cars presents a significant expense. Alternatives 2, 5, and 6 all cost approximately $23 million annually to maintain the NFTS, or approximately $5 million less than the other alternatives."

The FEIS page 743 now states that "All of the alternatives require approximately $10 million annually to fully maintain the designated motorized routes. See Table 3.08-4. Alternatives 1, 3, 4, and 7 cost the most to maintain at over $10.7 million. These alternatives have higher costs since fewer roads would be reclassified from Maintenance Level 3-5 to Maintenance Level 2 compared to Alternative 2, 5 and 6. Maintenance Level 3-5 roads account for the major amount of the expense in these alternatives. Alternatives 2, 5, and 6 each cost approximately $9.5 million annually to maintain, or about $1.2 million less than the other alternatives due primarily from changing Maintenance Level 3-5 roads to Maintenance Level 2".

The FEIS fails to explain the rationale for reducing the annual maintenance cost from $20,000,000 in the DEIS to $10,000,000 in the FEIS. Total miles of NFTS roads has gone from

47

2,529 in the DEIS to 2,791 in the FEIS and trail maintenance costs have gone from $566,970 in the DEIS to $540,735 in the FEIS (a minor difference). Back in 2005 the Roads Analysis stated: "Annual maintenance costs (Table 2.7) exceed $13,000,000". It hardly seems likely that costs have gone down in the last 5 years, given inflation.

The only response the Forest Service made on the question of affordability is in Appendix N page 137: "The affordability of the NFTS is analyzed in Chapter 3.08 (Transportation) of the FEIS in accordance with 36 CFR 212.55. A section on development of the Annual Road Maintenance Plan is included. In addition, the Travel Management Rule requires the Forest Supervisor to consider the cost of maintaining the designated route system. The Preferred Alternative reduces the cost of maintaining the NFTS compared to the existing condition."

This conclusion may be true, but it does not mean that required road and trail maintenance will be performed. Page 737 of the FEIS reports that "An estimated 28 percent of the TNF road system was fully maintained in 2007". Table 3.08-1 presents average annual maintenance costs for the TNF." Total costs from the table are $10,743,804 (which compares with $9,657, 288 from table 3.08-4). The budget for the year 2006 from table 3.08-2 on page 738 shows a base allocation of $719,000, collections from cooperative agreements of $226,260 and maintenance performed by non-forest service funds of $129,500 for a total of $1,074,760. If we grant the cost projections of FEIS table 3.08-4 on page 734 of $231,500 for Preferred Alternative 6 Implementation costs and $355,750 for Mitigation costs, over half of the annual budget based on year 2006 would be used just to add these unauthorized routes to the system.

This doesn't address the shortfall of $9,000,000 for annual road and trail maintenance, nor the "Deferred maintenance needs of almost $170,000,000 (Table 2.7 of the 2005 Draft Roads Analysis)".  A current estimate of road deferred maintenance on the TNF is $115,000,000 (FEIS Page 741).

The Federal Register [Federal Register: January 12, 2001 (Volume 66, Number 9)] stated: "the Forest Service is adopting a final policy governing the national forest transportation system. This action is necessary to ensure that National Forest System roads provide for public uses of National Forest System lands; provide for safe public access and travel; allow for economical and efficient management; to the extent practicable, begin to reverse adverse ecological impacts associated with roads; and meet all other current and future land and resource management objectives. The intended effects of this final policy are to ensure that decisions to construct, reconstruct, or decommission roads will be better informed by using a science-based roads analysis; that the availability of road maintenance funding will be considered when assessing the need for new road construction; and that, instead of focusing on constructing new roads, emphasis will be given to reconstructing and maintaining classified roads while decommissioning unnecessary classified and unclassified roads."

The Tahoe National Forest has improperly proceeded to carry out route designations under Subpart B of the Travel Management regulations (36 C.F.R. § 212—Travel Management) without first following the requirements under Subpart A, which have been in place since January 2001. Development of a minimum road system is the only way for the Tahoe to get its maintenance costs in line with its budget. Adding new routes is going the wrong direction.

48

There is simply no justification for designating new routes when the Forest cannot afford to maintain its current system and has such a significant maintenance backlog. If existing routes cannot be maintained, it is illogical to conclude that new routes added to the system would be treated any differently. Unmaintained and degraded roads may lead to substantial erosion, may collapse, and may cause serious safety problems.

The analysis of affordability in the FEIS does not address how the Forest will reduce the maintenance backlog or even how they will prevent the increase of a maintenance backlog. The DEIS also does not discuss how the Forest Service will fund the restoration of unauthorized trails not designated. Any available funds should be used for this purpose, instead of granting new routes. The FEIS only states that "The Preferred Alternative reduces the cost of maintaining the NFTS compared to the existing condition." This is not solving the problem.

In summary, the FEIS fails to acknowledge the Forest's inability to afford the proposed transportation system, provides insufficient analysis of the various alternatives, and violates policy directing the Forest not to add routes that it cannot afford. This decision to ignore the mandate of fiscal responsibility, and to not disclose this reality, is arbitrary and capricious and in violation of law.

### D.  THE FOREST SERVICE VIOLATED THE NATIONAL FOREST MANAGEMENT ACT

#### 1.  *THE FEIS AND ROD FAIL TO COMPLY WITH THE SIERRA NEVADA FOREST PLAN AMENDMENT (SNFPA) AND THE TAHOE LAND MANAGEMENT  FOREST PLAN*

The National Forest Management Act (NFMA) requires that "resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i). The Sierra Nevada Forest Plan Amendment (SNFPA) amended the Tahoe NF's Forest Plan with respect to management of the forest.  2004 SNFPA ROD at 15.   Therefore, the travel management plan ROD must conform to the SNFPA.

***Riparian Conservation Objectives, Standards, and Guidelines***

The SNFPA's aquatic management standards and guidelines are designed to ensure compliance with the Clean Water Act, maintain and restore habitat to support viable populations of native riparian-dependant species, and prevent the introduction and spread of noxious species.  SNFPA FSEIS App. A.

Routes within Riparian Conservation Areas (RCAs)

The Sierra Nevada Forest Plan Amendment (SNFPA) 2004 Record of Decision (ROD) requires that Riparian Conservation Areas (RCAs) be designated within the Tahoe National Forest.  The ROD prescribes that these areas be managed under Riparian Conservation Objectives (RCOs).

49

The purpose of the objectives is to meet SNFPA Goals to "maintain and restore" water quality, habitat, species composition, watershed, floodplain and water table connectivity, watershed condition, streamflow patterns and sediment regimes, stream banks and shorelines.   The intention of the SNFPA is to ensure that susceptible areas are set apart for forest managers as zones for careful decision-making.

Tables 2-65 and 2-66 of Volume II of the DEIS compare the density of routes and stream crossings, respectively, within RCA acres.  Every alternative in both tables puts at least one route and at least six stream crossings through the Truckee River which contains not only tens of thousands of RCA Acres, but is listed as an Impaired Water Body under section 303 (d) of the Clean Water Act.  An 'impaired' status indicates that it is not meeting water quality standards and that goals must be set to restore it.  The Tahoe FEIS provides no alternative where RCAs and impaired water bodies are unaffected and not subject to 'high' or 'higher' risk activities rather than strictly restorative ones.

Appendix R of the DEIS addresses the SNFPA ROD as it refers to riparian and aquatic management and attempts to demonstrate the compliance of the DEIS with the RCOs despite the many miles of route being designated within RCAs.  The Forest Service must recognize the importance of the Sierra Nevada Forest Plan Amendment and comply with the Record of Decision.  Routes placed within RCAs will affect ecosystems, with impacts that are improbably positive, which violates the purpose of designating sensitive areas for protection.

Not only should additional routes be kept out of RCAs, efforts should be made to restore any damage that has occurred therein.  There are many existing miles of motorized trail within designated RCAs and the proposed action would add further miles, despite the requirement of preservation.  The FEIS must analyze the impacts of the OHV trail designations on the specific riparian areas affected by disclosing how these OHV designation decisions meet the SNFPA's goals of maintaining and restoring watersheds and habitat.

*Noxious Weeds Management Standards and Guidelines*

The FEIS and ROD also fail as the decision relates to noxious weeds.  The Sierra Nevada Forest Plan Amendment (SNFPA) identifies standards and guidelines applicable to motorized travel management and noxious weeds:

37. Work cooperatively with California and Nevada State agencies and individual counties (for example, Cooperative Weed Management Areas) to: (1) prevent the introduction and establishment of noxious weed infestations and (2) control existing infestations.

38. As part of project planning, conduct a noxious weed risk assessment to determine risks for weed spread (high, moderate, or low) associated with different types of proposed management activities. Refer to weed prevention practices in the Regional Noxious Weed Management Strategy to develop mitigation measures for high and moderate risk activities.

40. Minimize weed spread by incorporating weed prevention and control measures into ongoing management or maintenance activities that involve ground disturbance or the possibility of spreading weeds. Refer to weed prevention practices in the Regional Noxious Weed Management Strategy.

Response for 3.06-7 of N-123 of the FEIS says: "However, roads and trails also increase the amount of area where weed seed can be introduced. Adding trails to the NFTS would increase the amount of area where vehicles could potentially introduce weeds. However when taken in the context of prohibiting cross country travel, including prohibiting use on unauthorized routes not added to the NFTS, there will be an overall net reduction in the risk of noxious weed spread."

Given the serious threat posed by invasive species, which Forest Service Chief Dale Bosworth described as one of the "four threats" to forests and rangelands, the failure of the Tahoe to comply with the SNFPA standards and guidelines for noxious weed management is unfathomable.   This failure is particularly egregious because the SNFPA standard and guidelines specifically direct the Forest Service to "(1) *prevent* the introduction and establishment of noxious weed infestations and (2) *control* existing infestations."  SNFPA Standard and Guideline #37 (emphasis added).  By designating 61.4 miles of routes in high and medium risk areas, we fail to see how the Forest Service is preventing or controlling infestations.   Moreover, the SNFPA directs the agency to "[m]inimize weed spread by incorporating weed prevention and control measures into ongoing management or maintenance activities that involve ground disturbance or the possibility of spreading weeds."  The FEIS occasionally refers to training maintenance crews in identifying weeds, but does not speak at all about prevention or control measures, which flatly violates the SNFPA and, by extension, NFMA.  For example route YRN-509 page A-638 says: "The cheatgrass is most dense at the turn around located near the electronic site. Mitigation measure required: None."

The failure to conform to the requirements of the SNFPA are clear violations of the laws and regulations governing the Forest, and, as such, the decision is arbitrary and capricious.

## 2. THE FEIS VIOLATES NEPA BECAUSE IT FAILS TO TAKE THE REQUISITE "HARD LOOK" AT DIRECT IMPACTS TO DEER FROM THE ADDITION OF ROUTES TO THE MOTORIZED SYSTEM.

The Travel Management ROD and FEIS fail to adequately analyze and mitigate Direct, Indirect and Cumulative impacts to Mule deer.

1.  The analysis violates NEPA because it fails to take the "hard look" at potential impacts of the project required by that statute. The analysis is incomplete and inadequate because the FEIS sets no thresholds by which to measure impacts to Mule deer by any of the alternatives.  The Tahoe National Forest Land Management Plan (1990) provides management direction for deer habitat management*: "Limit vehicle access on key deer winter ranges when deer are present.  Also limit vehicle access in key summer range habitats during periods of migration and fawning."* Inherent in this direction is the understanding that, at some level, vehicle travel does adversely impact deer on their winter range, as well as while migrating and fawning.  "Limit," therefore,

means keep the level of vehicle traffic below the threshold at which it becomes harmful to deer. This is a simple, straightforward, easy to understand direction.

The percent disturbance numbers produced as a result of applying a disturbance corridor to route mileage in the alternatives only provide relative values.  According to the FEIS, *"route density has often been used as a surrogate to estimate habitat effectiveness or the direct and indirect effects of motorized routes on terrestrial wildlife. Route density thresholds for wildlife have not been established on the Tahoe NF, and thresholds for wildlife in the literature can vary by season and by geographic location. Therefore, road density "thresholds" will not be used to determine effects of the action alternatives, but rather road density is used for a relative comparison of the alternatives.* (FEIS, P. 172) (Emphasis added)

Absent a threshold value to indicate at what level the disturbance becomes detrimental to deer, the disturbance values have no usefulness, other than to compare one alternative with another, which is what the Tahoe NF has done.  But it provides no information whatsoever as to the effect of the disturbance on deer; nor does the FEIS provide any other tool to measure impact on deer from vehicle use.

Instead, the FEIS and ROD make conclusory assumptions that habitat disturbance levels of 30 to 44% will not adversely affect deer on their winter and summer ranges. The FEIS asserts, *"All the action alternatives result in a "Low" influence to key summer and winter ranges from the addition of routes unauthorized for motorized public use."* (FEIS, p. 206).   It is absurd to assert the influence of an additional 6 or 9 miles of trail will be "low," when the existing system has a moderate impact.

2.  The ROD removes the seasonal closure to vehicles in Management Area 84, Humbug Sailor, which the Land Management Plan imposed for the protection of winter-stressed mule deer.  This violates the Tahoe National Forest Land Management Plan (1990), which provides management direction for deer habitat management*:  "Limit vehicle access on key deer winter ranges when deer are present.  Also limit vehicle access in key summer range habitats during periods of migration and fawning."*

The FEIS makes conclusory statements regarding the LRMP Amendment to Change Season of Use in the Humbug-Sailor Management Area: "*Due to the complexity of factors that affect deer population trends (i.e., urbanization, hunting, long-term habitat condition, annual weather variation, etc.), it is not likely that amending the LRMP to change the season of motorized use within the Humbug-Sailor Management Area under Alternatives 5 and 6 by 2-3 months and for Alternative 2 by 6 months, affecting less than 8% of key winter range, would significantly affect deer such that population numbers of the Blue Canyon deer herd would change.*" "(FEIS p. 234)  As the FEIS provides no thresholds by which to measure impacts, the determination that the degradation of 8% of the Blue Canyon herd's winter range is insignificant is baseless and conclusory.  Nor is there any analysis regarding the quality of the other 92% of the herd's winter range.

The assertion in the DEIS Table 3.03-15 (*Motorized Seasonal Closures Benefiting Deer Ranges on the Tahoe National Forest*) is misleading.  The intent of the seasonal closures is the protection

of roads and trails, not deer.  Amending the Tahoe Land Management Plan to remove the existing November 1 to May 1 seasonal closure in Management Area 84  (Humbug Sailor) under Alternatives 2, 5, and 6 does not benefit wintering deer; it increases the disturbance period by 33%.  The wet weather closure of January 1 to April 30 opens critical winter range for an additional two months during the time deer are on the winter range.  This exposes them to pressures from recreation activity during that critical time.  It also provides additional access for poaching when deer are concentrated on their winter range.

There is no analysis behind the conclusion that the wet season closures will somehow make up for the loss of winter range protection during the time deer are present.  There is no "hard look" as required by NEPA, simply wishful thinking.

<u>Other Direct Impacts to Mule Deer</u>

The DEIS doesn't address the qualitative impact of routes.  Mule deer in winter rely primarily on south facing slopes and ridge tops for forage and warmer microclimates.  The DEIS provides quantitative data regarding miles of routes, but without identifying the location of these routes, the actual impact is not disclosed.

Designation of additional system routes will result in illegal cross-country use adjacent to those routes.  The DEIS fails to address this direct impact.

The Discussion and disclosure of Cumulative Impacts to deer is inadequate:

1.  Habitat Capability:  The DEIS includes no discussion of the overall habitat capability of mule deer habitat on the Tahoe National Forest.  There is no analysis of the condition of summer and fawning habitat, especially meadows.  There is no analysis of available forage or cover on winter range.  There is no analysis of how native forage is being affected by exotic species.

2.  The Tahoe National Forest lies within DAU 3, a mule deer management unit.  According to a mule deer working group, which included the California Department of Fish and Game, Bureau of Land Management and Regional 5 USDA Forest Service, the, the deer population in DAU 3 has declined dramatically in recent years.  DAU 3 is a *"top priority area(s) to attempt to reverse the decline in deer populations through habitat-based efforts. The primary habitat targets are shrub-dominated winter ranges, riparian-wetland areas, and forested understory communities."* [49]

The FEIS asserts deer numbers are stable or increasing, using California Department of Fish and Game deer population numbers based on hunting success. (FEIS P. 214, 215).  However, the FEIS later admits hunting success is only one of several tools for assessing deer herd size.  As the FEIS notes:  *"The mule deer has been monitored in the Sierra Nevada at various sample locations by herd monitoring (spring and fall) and hunter survey and associated modeling (CDFG 2007). California Department of Fish and Game (CDFG) conducts surveys of deer herds in early spring to determine the proportion of fawns that have survived the winter, and conducts*

---

[49] REPORT TO THE FISH AND GAME COMMISSION :An Assessment of Mule and Black-tailed Deer Habitats and Populations in California With Special Emphasis on Public Lands Administered by the Bureau of Land Management and the United States Forest Service , February 1998

*fall counts to determine herd composition (CDFG 2007). This information, along with prior year harvest information, is used to estimate overall herd size, sex and age rations, and the predicted number of bucks available to hunt (ibid). These data indicate that mule deer continue to be present across the Sierra Nevada, and current data at the range wide, California, and Sierra Nevada scales indicate that, although there may be localized declines in some herds or Deer Assessment Units, the distribution of mule deer populations in the Sierra Nevada is stable.*
(FEIS, p. 233)

The FEIS fails to disclose what these broader data disclose regarding the four deer herds whose summer and winter ranges fall within the Tahoe NF. The FEIS should have included a discussion of the status of the four Tahoe NF deer herds and whether any of these are experiencing "localized declines." As a Management Indicator Species, the Tahoe should be monitoring actual numbers on the Forest.

3. Noxious Weeds: The DEIS fails to analyze the impact of noxious weeds, such as cheat grass, on forage for mule deer. Noxious weeds have been described by the Forest Service former Chief Dale Robertson as one of the "four threats" to our National Forests. The replacement of native browse species by non-natives such as cheat grass is cited as one of the factors affecting mule deer on both summer and winter ranges. Vehicles are known to spread noxious weeds and several of the routes being proposed for designation harbor noxious weeds. Neither the DEIS nor the FEIS discuss this very significant potential impact to deer on the Tahoe NF.
The above violations of the forest plan are clear violations of the laws and regulations governing the Forest, and as such are arbitrary and capricious.

### 3. THE FOREST HAS ALSO FAILED TO FOLLOW REGULATIONS RELATED TO WILDLIFE PROTECTION.

The Sierra Nevada Forest Plan Amendment (SNFPA) requires the Forest to "evaluate proposals for new roads, trails, off-highway vehicle routes, and recreational and other developments for their potential to disturb nest sites…and den sites" of fisher, marten, spotted owl and goshawk (management Standards and Guidelines 82, 87, and 89).

The FEIS failed to evaluate the impacts to specific nest and den sites. roads/routes which almost all pass through sensitive wildlife habitat including habitat for wolverine, deer summer range, mountain quail, closed canopy habitat for marten and spotted owl, sooty (blue) grouse, great gray owl, and Pacific tree frog habitat, carnivore network, bald eagle nest site, and yellow-legged frog and fox sparrow habitat. None of these routes were examined for an alternative or closing of the route. For example, route TKN-J9 (.3 mile) goes through Worn Mill goshawk PAC (R05F17D57T11).

In addition, the SNFPA requires the following, which were not addressed in the FEIS:

Connectivity for Old Forest Associated Species
- Minimize old forest habitat fragmentation. Assess potential impacts of fragmentation on old forest associated species (particularly fisher and marten) in biological evaluations. (Standards and Guidelines 27)

- Assess the potential impact of projects on the connectivity of habitat for old forest associated species. (Standards and Guidelines 28)
- Consider retaining forested linkages (with canopy cover greater than 40 percent) that are interconnected via riparian areas and ridgetop saddles during project-level analysis. (Standards and Guidelines 29)

## E.  THE ROD AND THE FEIS VIOLATE THE ENDANGERED SPECIES ACT

The Endangered Species Act's purpose is to conserve endangered and threatened species and the ecosystems on which they depend.[50] The ESA defines "conserve" as "to use and the use of all methods and procedures which are necessary to bring any endangered or threatened species to the point at which [ESA protection is] no longer necessary."[51] In other words, the ESA requires both survival and recovery of a listed species.[52] To that end, Congress imposed substantive and procedural requirements on federal agencies. Substantively, section 7 requires all federal agencies to use their authority "in furtherance of the . . . conservation of endangered species and threatened species,"[53] and it prohibits any action that is likely to jeopardize a species or its critical habitat.  Procedurally, in order to determine whether an agency action will jeopardize a listed species, the action agency must consult with the Fish & Wildlife Service (FWS) and/or the National Marines Fisheries Service (NMFS).[54]

Section 7 embodies an explicit congressional decision to give first priority to conserving endangered species, a priority that overrides other statutory missions of federal agencies.[55]  In applying section 7, an agency must "give the benefit of the doubt" to the species.[56]  In fact, in language that "admits of no exception,"[57] the ESA requires federal agencies to "insure" that their actions are not likely to jeopardize the continued existence of threatened and endangered species or adversely modify the species' designated critical habitat.[58]  In this way, an agency complies with the ESA's policy of "institutionalized caution."[59]  In meeting this unambiguous and "rigorous" requirement,[60] agencies must base their decisions on the best scientific and commercial data available.[61]

### 1.  Failure to Consult

---

[50] Endangered Species Act of 1973, 16 U.S.C. § 1531(b) (2006).

[51] *Id.* § 1532(3) (defining "conserve," "conserving," and "conservation" as having the same meaning).

[52] Sierra Club v. U.S. Fish & Wildlife Serv., 245 F.3d 434, 441–42 (5th Cir. 2001) ("'Conservation' is a much broader concept than mere survival. The ESA's definition of 'conservation' speaks to the recovery of a threatened or endangered species."); Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv., 378 F.3d 1059, 1070 (9th Cir. 2004) ("[T]he ESA was enacted not merely to forestall the extinction of species (i.e., promote a species survival), but to allow a species to recover to the point where it may be delisted.").

[53] 16 U.S.C. § 1536(a)(1) (2006).

[54] 16 U.S.C. § 1536(a)–(d) (2006).

[55] *See* Tenn. Valley Authority v. Hill (TVA v. Hill), 437 U.S. 153, 185 (1978).

[56] Sierra Club v. Marsh, 816 F.2d 1376, 1386 (9th Cir. 1987) (citations omitted).

[57] TVA v. Hill, 437 U.S. at 173

[58] 16 U.S.C. § 1536(a)(2).

[59] TVA v. Hill, 437 U.S. at 194.

[60] Marsh, 816 F.2d at 1385

[61] 16 U.S.C. § 1536(a)(2).

Section 7 of the ESA establishes an interagency consultation process to assist federal agencies in complying with their duty to ensure against jeopardy to listed species or destruction or adverse modification of critical habitat.  An agency must initiate consultation under Section 7 whenever it takes an action that "may affect" a listed species.  50 C.F.R. § 402.14(a).  Regulations implementing Section 7 and Ninth Circuit case law broadly define the scope of agency actions subject to consultation.[62]  Informal consultation is an optional process in which the action agency determines whether the proposed action "may affect" a listed species; it is designed to assist the FWS in determining whether formal consultation, including preparation of a biological opinion, is required for the proposed action.  50 C.F.R. § 402.13(a).  In order to avoid formal consultation, the FWS must provide a written concurrence that the proposed action will have no effect on or is not likely to adversely affect listed species or critical habitat.  *Id.*  The consultation process concludes when the expert agency, in this case FWS either issues a concurrence letter affirming the action agency's no effect or may affect/not likely to adversely affect (NLAA) determination or prepares a biological opinion (BiOp) on the impacts of the agency action to listed species.[63]  If the BiOp concludes jeopardy to the species or adverse modification to critical habitat is likely, the FWS must prepare reasonable and prudent alternatives, and often a jeopardy opinion will require preparation of an incidental take statement in order to shield the action agency from the take prohibition of section 9.   Pending the completion of the consultation process, agency actions that may affect listed species cannot go forward.[64]

Thus, the Forest Service must consult with FWS regarding the adequacy of travel planning to avoid jeopardizing any listed species or damaging critical habitat and to ensure that its actions further the conservation of listed species.  As further discussed below, the Forest has failed to adequately consult with FWS about the impacts from the ROD.

The Pacific Southwest Region of the Forest Service entered into a programmatic agreement with the FWS for motorized route designation before even scoping for any of the travel management plans had begun. On December 27, 2006, the FWS issued a Letter of Concurrence for 14 National Forests in California, including the Tahoe National Forest. The Letter of Concurrence approved the Project Design Criteria (PDC) as outlined in the document entitled "Route Designation: Project Design Criteria for 'No Effect' or 'May Affect Not Likely to Adversely Affect' Determination for TE Species – October 2006 version 1."  According to the programmatic agreement, if the routes proposed for designation follow the Project Design Criteria, no further consultation with the FWS is required.

---

[62] *See*  50 C.F.R. § 402.02 (defining "agency action"). Pacific Rivers Council v. Thomas, 30 F.3d 1050, 1054–55 (9th Cir. 1985); Natural Res. Def. Council v. Houston, 146 F.3d 1118, 1125 (9th Cir. 1998); Connor v. Burford, 848 F.2d 1441, 1453 (9th Cir. 1988); see also Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency, 345 F.Supp.2d 1151 (W.D. Wash. 2004) (holding various components of National Flood Insurance Program are discretionary agency actions requiring Section 7 consultation).

[63] *See generally* Thomas v. Peterson, 753 F.2d 754, 763 (9th Cir. 1985).

[64] *See id. at* 764 ("If a project is allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result.  The latter, of course, is impermissible."); Pacific Coast Federation of Fishermen's Associations v. Bureau of Reclamation, 138 F.Supp.2d 1228, 1248 (N.D. Cal. 2001) (enjoining irrigation water deliveries at Klamath project pending completion of ESA consultation).

Beyond the fact that this type of pre-proposal consultation is generally not sufficient to satisfy the requirements of the ESA, the "programmatic concurrence" at hand is inadequate under the ESA, in part, because the FWS has never examined whether the PDCs will avoid a "may affect" finding in the context of the actual alternative selected by the forest.  The Project Design Criteria included in the Letter of Concurrence are flawed in and of themselves because they do not address the potential impacts on listed species from designation of existing system routes or from new route designation under changing climatic conditions. Therefore, the consultation conducted between the Forest Service and the FWS was inadequate because it did not go beyond the requirements of the programmatic agreement and analyze the impacts of climate change on listed species like the California Red-legged frog or Lahontan Cutthroat Trout. The District Court in the Eastern District of California has required agencies to look into the possible effects climate change will have on endangered species and critical habitat.  In *Natural Resources Defense Council v. Kempthorne*, 506 F. Supp. 2d 322, 370 (E.D. CA 2007), the court held that the FWS acted arbitrarily and capriciously when its biological opinion (BiOp) of a Project Operations Criteria and Plan for a water delta failed to consider how climate change may affect the hydrology of the water delta and ultimately an endangered fish, the Delta smelt (*Hypomesus transpacificus*). The court found that the BiOp was inadequate because it did not look at any of the possible climate change scenarios and how these could affect the future delta hydrology. *Id*. Specifically, the court found that the "absence of *any* discussion in the BiOp of how to deal with any climate change is a failure to analyze a potentially 'important aspect of the problem.'" *Id*. The programmatic concurrence and NEPA analysis is deficient for the same reasons.

Further, because the PDC's only apply to routes added to the existing system, the FWS and Forest Service have never consulted on the effects of the motorized travel system as a whole on the listed species and critical habitat in the Tahoe, despite the fact that the entire travel system will be displayed on the MVUM that results from this travel plan.  The Forest Service must now remedy the situation by submitting the BA to the FWS in order to determine whether it concurs with the no effect and NLAA determinations made in the context of the selected alternative, which includes and carries forward the entire existing, designated system.

Finally, as mentioned above, the Forest Service is also in violation of the requirements of the ESA as it relates to the existing system routes which were designated in this process and will be open for future motorized use on the MVUM.  The Forest failed to look at or consult on the effects of existing system routes before the routes were designated.  By excluding thousands of miles of existing, designated routes from the 2007 informal consultation, the Forest Service has likely grossly underestimated the effects the travel plan will have on listed species and critical habitat.  The Forest must consult on the impacts that will result from the act of designating all of the National Forest Transportation System, not merely those routes that it has classified as "additions."  Moreover, given the scope of the programmatic concurrence, the Forest has also failed to apply the PDCs to existing, designated routes.  Assuming, for the sake of argument, that those PDCs are effective and needed in order to avoid a "may affect" determination, the Forest Service has shirked its obligations to conserve listed species with respect to the existing system, and it likely has failed to insulate itself from the take prohibition of section 9.

Therefore, the FEIS and ROD are in violation of the requirements of the ESA and should be remanded for appropriate consultation.

### 2. *Violation of Section 9; Unlawful Taking of Listed Species.*

The ESA prohibits any "person" from "taking" threatened and endangered species. 16 U.S.C. § 1538, 50 C.F.R. § 17.31. The definition of "take," found at 16 U.S.C.§ 1532(19), states:

> The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

The Forest Service is in violation of Section 9 of the ESA because it is in violation of Section 7(a)(2), and has failed to consult with the Fish and Wildlife Service regarding the impacts of the Forest Service's travel management decision for the Tahoe NF on the California red-legged frog. Because the Forest Service has not obtained a biological opinion for the travel management plan adopted, no take of the California red-legged frog is properly authorized. Regardless, the Forest Service's approval of the Tahoe NF travel plan will allow taking of (in the form of harassment, harm, pursuit, wounding, or killing) of the CRLF in violation of ESA's Section 9.

### 3. *Violation of Section 2(c) and 7(a)(1); Failure to Conserve Listed Species.*

Section 2(c) of the ESA establishes that it is " . . . the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act." 16 U.S.C. § 1531(c)(1). The ESA defines "conservation" to mean ". . . the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." 16 U.S.C. § 1532(3). Section 7(a)(1) of the ESA requires that all federal action agencies "shall, in consultation and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered species and threatened species . . ." 16 U.S.C. § 1536(a)(1), ESA § 7(a)(1). *See Pyramid Lake Paiute Tribe v. U.S. Dept. of the Navy*, 898 F.2d 1410, 1417 (9th Cir. 1990) ("agencies have affirmative obligations to conserve under section 7(a)(1)"). Accordingly, the Forest Service, must administer the National Forests "in furtherance" of species conservation.

The Forest Service is violating section 2(c) and 7(a)(1) of the ESA because the agency's actions have not furthered the purpose of the ESA and conservation of the California red-legged frog but, rather, have allowed and authorized impacts to individuals of the species as well as impacts to habitat that increases the risks to the conservation and recovery of the species. Unfortunately, the Forest Service's Riparian Conservation Objectives are not adequately designed or implemented to provide the affirmative conservation for this riparian dependent species and its habitat. By failing to adopt the specific conservation measures to protect and conserve the California red-legged frog and assist in recovery of the species on the Tahoe NF or elsewhere in the Sierra Nevada, the Forest Service has failed to fulfill its duties under the ESA.

## IV.   REQUEST FOR RELIEF

<u>Immediate relief</u>

Based on the information provided in this appeal, it is clear that the Responsible Official's decision failed to comply with law, regulation, and policy. Appellants respectfully request that:

1) The Record of Decision for the Tahoe National Forest Motorized Travel Management Final Environmental Impact Statement be withdrawn and a new analysis and decision be issued that is in compliance with the law.

2) During the pendency of that analysis, the Forest Service shall issue a temporary forest order immediately closing the forest to cross-country travel, which shall remain in force until such time as the Forest Service is able to produce a legally sufficient Travel Management Plan and publish its MVUM. This closure order will also include the physical closure of all undesignated routes, and the seasonal closures and dates described in Alternative 4.

<u>Prior to the analysis required under 36 CFR Part 212 Subpart's B and C</u>

1) The Tahoe National Forest must conduct a broad-scale, science-based travel analysis (as described in Forest Service Manual 7712 and Forest Service Handbook (FSH) 7709.55, Chapter 20) that examines all system roads (maintenance levels 1-5) and motorized trails. The travel analysis must include a route-by-route assessment and landscape scale assessment of the risks and benefits associated with the NFS road system, including impacts on wildlife and non-motorized recreation. It must also include recommendations on seasonal closure of roads/routes, recommendations on routes for decommissioning, and analysis of impacts of changes in maintenance level, vehicle class and dispersed camping one-vehicle length rule. It must be based on the updated maps that were determined by the SDEIS analysis of the last 15 years of NEPA based projects, actual granted rights-of-way and road maintenance levels based on field examination of road conditions.  The TNF 2004 Draft Road Analysis should be used as a resource for the analysis, supplemented by Level 1 and 2 road analyses.

2) Following the travel analysis, the agency must determine the minimum transportation system as required by Subpart A, and publish a prioritized list of routes recommended for closure and decommissioning (based on watershed analysis), along with a proposed timeline for ecological restoration work for legacy sites.

3) This minimum transportation system must be fundable from reasonable, foreseeable annual budgets based on historical funding levels that allows the roads to be maintained at their appropriate level without impacting or degrading the environment. These funds must include restoration needs for degraded water bodies.

4) The Travel Analysis Process (TAP) and Minimum Road System (MRS) identification from Subpart A is be used to inform designation decisions under Subpart B. Subpart B will have a Purpose and Need that includes not only determining possible route additions, but also possible closure and decommissioning of existing routes, including routes that can only be accessed via private lands for which no right-of-way has been obtained..

5) There must be a NEPA process in which the FS will examine the environmental effects of and approve the decommissioning (including obliteration) of the prioritized list of unneeded roads they have identified for decommissioning.